---

E   X   H   I   B   I   T   **"D"**

---

1  picked up?

2  A.    Because Andre was receiving cocaine from Raymond.  And

3  Raymond was getting it from Jose.  Originally, Raymond was

4  getting it from his brother, Marco, but Marco, the police was

5  on him, so Marco left and went back to the Dominican Republic.

6  So the only way Raymond could get it would be by dealing with

7  Jose.  And Johnny didn't want Raymond getting as much as he was

8  getting from Jose.

9  Q.    And by telling Jose that perhaps Raymond was now in

10  trouble with the police, the hope was that Jose and Raymond

11  would stop dealing with one another?

12  A.    Right.

13  Q.    And that information, the defendant told you he conveyed

14  that information around the time period when he knew Jose and

15  Raymond were going to the Dominican Republic?

16  A.    Right.

17  Q.    Why would he have done that, did he explain that to you?

18  A.    Wasn't nobody expecting Raymond to make it back.

19  Q.    And by not expecting Raymond to make it back, you mean

20  the hope was that Raymond Simmons would be killed in the

21  Dominican Republic?

22  A.    Exactly.

23  Q.    What was the nature of your relationship with Jose?

24  A.    I didn't have a relationship with Jose, I just knew him

25  by meeting him through John.

1    Q.    And Jose, did he speak primarily Spanish or English?

2    A.    He spoke Spanish, he tried to make people think he didn't

3    know how to speak English, but he knew English, too.

4    Q.    Was it your experience that Jose would frequently have

5    somebody interpreting for him?

6    A.    He would always have his son with him so that he could

7    have him interpret what he's saying.

8    Q.    Did you know at that point in time when you were around

9    the defendant, did you know if Jose was providing crack cocaine

10    to anybody else on this defendant's behalf?

11    A.    If Jose was providing it?

12    Q.    Yes.

13    A.    I only knew that he was giving the predominant amount to

14    Johnny or to Raymond.

15    Q.    By Johnny, do you mean the defendant?

16    A.    Yes.

17    Q.    Now, on the streets of Erie at this time, you've

18    explained to the jury you had Jose here and he's giving it to

19    Ray Simmons and the defendant?

20    A.    Right.

21    Q.    If you know, who was selling the drugs on the streets of

22    Erie for cheaper at that point in time?

23    A.    You mean, are you saying was there anyone else that was

24    selling?

25    Q.    No. Compare the price of Ray Simmons' crack to the price

1  of the defendant's, who was selling it for cheaper, if anybody?

2  A.    Raymond was selling it cheaper on the streets than Johnny

3  was.

4  Q.    And this crack that was coming from Jose, was that highly

5  sought after crack on the streets of Erie?

6  A.    Yes.

7  Q.    How much cheaper was Ray Simmons selling it than the

8  defendant was?

9  A.    Raymond was selling his for like $750 and $800,  while

10  Johnny was selling it for $1,100.  Johnny wanted him to get out

11  of the way so he could keep it at $1,100 because they had the

12  same kind of cocaine.

13  Q.    Now, the crack that was coming from Jose, in your

14  experience would it have been possible to take that crack and

15  even add more baking soda to it to extend it out?

16  A.    Once it's already been cooked, you can't put more baking

17  soda on it.

18  Q.    Usually the crack just came and then went in that form

19  that it was in to other people?

20  A.    Yes.

21  Q.    Did this defendant ever share with you in conversations

22  with you, why it is that he wouldn't have just handed the drugs

23  to you rather than put them in a stove or put them in a trash

24  can?

25  A.    He says as long as he didn't hand it to me, that no one

1   could ever charge him with anything because he never made hand

2   to hand contact with anyone.

3   Q.    Now, is that kilo in the stove that you received from the

4   defendant, is that the last crack cocaine that you ever

5   received from the defendant?

6   A.    Yes.

7   Q.    What is it that caused your crack cocaine relationship

8   with the defendant to stop?

9   A.    He was afraid that you all was on him too much, so he

10  said he was going to cool off for a little while.

11  Q.    Let me just make sure that the jury understands, you said

12  he was afraid that we were on him too much?

13  A.    He knew that you all was following him.

14  Q.    How did he know that?

15  A.    Because there was different times when you parked all

16  around the house and different times when you were following

17  him.

18  Q.    And he shared that with you?

19  A.    It was obvious.

20  Q.    Now, did something else, namely, the price of his crack

21  cocaine, cause your relationship, the crack cocaine

22  relationship with the defendant to stop?

23  A.    The reason why I stopped is because he had made his quota

24  of money, so he didn't care about whether somebody else made

25  their quota, he just wanted to stop for awhile because you all

50

1  was really following him a lot.

2  Q.   What were you doing with the money that you were making,

3  I think you told the jury you were making approximately $200 an

4  ounce on the crack, is that accurate?

5  A.   Yes.

6  Q.   What were you doing with the money?

7  A.   Repairing my house.

8  Q.   You have 36 ounces of crack, you theoretically could have

9  made approximately $200 per ounce, would you agree with me

10  that's $7,200?

11  A.   Yes.

12  Q.   Would you always, when you distributed it out, would you

13  always receive the full $7,200 back or did some people short

14  you out?

15  A.   Sometimes I would be short.

16  Q.   Were there times when you just didn't collect the full

17  amount of money?

18  A.   Yes.

19  Q.   And who had to make up this shortfall, did you have make

20  up the shortfall, did the defendant accept less money from you?

21  A.   No, I always had to make the shortfall, make up for it.

22  Q.   In the world of distributing crack, were people always

23  reliable in returning the money to you?

24  A.   Most of the time.

25  Q.   But there were times when there was a shortfall, you had

1    to cover it?

2    A.    Any time it was short, the money would have to come from

3    me because it was originally fronted to me, so I had to pay the

4    bill.

5    Q.    Now, are you familiar with the term, I think you

6    mentioned it before, are you familiar with what the term

7    meltdown is?

8    A.    Yes.

9    Q.    That is just a reference to the quality of the crack

10    cocaine?

11    A.    Right.

12    Q.    What does that mean exactly?

13    A.    That means if you put a piece of crack on a pipe and you

14    put a lighter to it, it will melt right down instead of leaving

15    different residues on your screen.

16    Q.    And the residue would be the --

17    A.    The cut.

18    Q.    The cut that would be on it.  The cut is what?

19    A.    It could be B12 vitamin, lactose or anything, or just

20    baking soda.

21    Q.    Now, around March, April of 2001, did you start receiving

22    drugs from other people, other than the defendant?

23    A.    Yes, from Michael Colegrande and Paul Licato.

24    Q.    And those are the people that you ultimately got hooked

25    up with when you got charged with drugs?

52

1   A.    Yes.

2   Q.    Did you have any discussions with the defendant about

3   Licato and Colegrande and your relationship with them?

4   A.    Yeah, he told me I shouldn't mess with them because those

5   Italian dudes is going to take me down when they go down.  In

6   other words, if they ever get arrested, they were going to get

7   me arrested, also.

8   Q.    Now, have you ever had any discussions with the defendant

9   about him having any source in law enforcement or obtaining

10   information from law enforcement people?

11   A.    He just told me he had different hookups, so he knew when

12   you all coming at him, so he knew when to clean up stuff.

13   Q.    Did he tell you who some of these hookups, as you

14   referred to them, are?

15   A.    He wouldn't give me the names, he just told me that he

16   had different hookups where he could, he would know

17   information, when you all are coming.

18   Q.    And you've already told the jury that a woman he has a

19   child with works at the Erie County Jail as a corrections

20   officer?

21   A.    Yes.

22   Q.    Do you know him to have any relatives that during the

23   timeframe of this conspiracy that worked at the Erie Police

24   Department?

25   A.    He had a relative that worked there, yes.

53

1   Q.   Who would that be?

2   A.   Jerome Odom.

3            THE COURT:  Who?

4            THE WITNESS:  Jerome Odom.

5   BY MR. TRABOLD:

6   Q.   Jerome Odom?

7   A.   That's his relative.

8   Q.   With regard to -- did you ever have any discussions with

9   this defendant about him going to Virginia?

10  A.   He told me a lot of times he'd take money down to

11  Virginia and leave it there.

12  Q.   Did he explain to you why he would take it to Virginia?

13  A.   So he wouldn't have that much money laying around here.

14  Q.   And who was he taking it to in Virginia or where was he

15  taking it to?

16  A.   Really I don't know.  I know he got relatives in

17  Virginia, I never went with him or anything, but he told me he

18  took it to Virginia.

19  Q.   Did he ask you ever to go with him to Virginia?

20  A.   Yes.

21  Q.   Did you go with him?

22  A.   No.

23  Q.   Why?

24  A.   I was still on parole and everywhere I go I have to let

25  the parole officer know where I was going.  So I didn't want to

54

1   go.

2   Q.   Did he tell you what time of day he would drive to

3   Virginia?

4   A.   He said most of the time he leaves late at night, 2,

5   3 o'clock in the morning.

6   Q.   Did he tell you why he leaves at 2, 3 o'clock in the

7   morning?

8   A.   Yeah, that usually the time when you all take a break.

9            THE COURT:  Just for the record, when you say, I

10   think it's clear, but when you say you all, you've been using

11   that phrase, who specifically do you mean?

12           THE WITNESS:  The FBI.

13   BY MR. TRABOLD:

14   Q.   Now, do you have any firsthand knowledge of times when

15   this defendant has warned you or told you, hey, you got to take

16   it easy, the police might be watching?

17   A.   Yeah.

18   Q.   How many times did that occur?

19   A.   It's been a few times he told me, you know, you better be

20   careful because they're really following you now.

21   Q.   And that happened during this timeframe when you're

22   talking about, late 2000?

23   A.   Yes.

24   Q.   Did there ever come a period of time when he showed you,

25   for lack of a better term, something like a listening device?

55

1   A.   Yes, a listening device where he could listen to people's
2   conversations on telephones.
3   Q.   Explain that to the jury, how did you become familiar
4   with that?
5   A.   Because he was telling me, he said, you know, I got this
6   little listening device, you know, because he always wanted to
7   tell me that my wife was cheating on me and stuff like that.
8   So he told me, I came outside one day, he was out front in his
9   truck, he said I see your wife on the telephone, he says do you
10  want to listen to her conversation.  I said listen to her
11  conversation.  He said yeah, I can turn this on, you can listen
12  to it.  So he turned it on and sure enough she was on the
13  telephone talking.  She was talking to one of her friends on
14  the telephone.  I'm like how do you that.  I told you I got a
15  hookup.
16  Q.   And what did you take him to mean when he said he's got a
17  hookup?
18  A.   As far as he could listen in on telephone calls,
19  different people's telephone calls.
20  Q.   Did you ever have any discussions with this defendant
21  about voodoo?
22  A.   Yes.
23  Q.   Explain that to the jury, what was the nature of those
24  conversations?
25  A.   In '96 when I caught a cocaine charge --

56

1   Q.    Let me stop you for one minute.  When you say you caught
2   a cocaine charge, just so the jury understands, you mean when
3   you were charged again with a new offense?
4   A.    Yes.
5   Q.    Okay.  Go ahead?
6   A.    John came to me and he told me, he said, Jimmy, really
7   you ain't got to do no time.  I said what do you mean by that.
8   He said, man, all you got to do is get in touch with this lady
9   that knows voodoo and she'll send you something, every now and
10  then you send her some money, and you don't have to do no time.
11  He said I ain't did no time, I ain't doing no time for nobody.
12  He said I tell my mom, I ain't doing no time for nobody.
13  Q.    What does that have to do with voodoo, did he explain how
14  it was he wasn't going to do any time?
15  A.    He just told me that if I got in touch with her and I did
16  what she told me to do, then I wouldn't have to no time.  I
17  told him, I said, you know, I'm not into nothing like that, I
18  said I believe in God.  He said, well, you know, he said you
19  should still get in touch with her, you wouldn't have to do no
20  time.  So any way, about a week or so later I got a letter in
21  the mail from this lady and it had other little things inside
22  of it telling me to do this and do that, and get back in touch
23  and send her X amount of money.  And I just never did that.
24  Then when it came time for me to get sentenced everything, he
25  told me, see if you had done what I had told you, you would

57

1  have never went to jail.

2  Q.   Now, these things you're talking about, what do you mean

3  things, what was in there?

4  A.   It was like little things to read, it was like a little

5  necklace that I was supposed to put on when I go to court.

6  Q.   A necklace you were supposed to put on?

7  A.   Yeah, at Little necklace that I was supposed to wear in

8  court.

9  Q.   You didn't wear the necklace?

10 A.   No.

11 Q.   Was it like a garlic necklace?

12 A.   It had little feathers and little rocks and stuff on it.

13 Q.   And where was this woman located in?

14 A.   In Detroit.   That's where the mail came from.

15 Q.   Now, did you ever have any discussions with this

16 defendant about the topic of somebody testifying against him in

17 court?

18 A.   Yeah, I had a conversation with him about it, because I

19 had told him if I ever get caught with this stuff again, I will

20 probably do life.   He said, well, I ain't worried about doing

21 no life, he said I ain't going out like Carl Knight.   He said

22 whoever gets me in trouble down here, I already got something

23 put aside to take care of them.

24 Q.   By take care of them, what did you take him to mean?

25 A.   Probably killing them.

58

1    Q.    Explain to the ladies and gentlemen of the jury, do you

2    know, who's Carl Knight?

3    A.    Carl Knight was convicted, I think in '98, for

4    trafficking in crack cocaine, he got a life sentence.

5    Q.    Was it a case where various people came in and testified

6    against him?

7    A.    Yes.

8           MR. TRABOLD:  Can I have one moment, your Honor.

9           THE COURT:  Sure.

10   BY MR. TRABOLD:

11   Q.    Mr. Crockett, back in a little more than a year ago, did

12   you have a discussion with your brother, Frank, about

13   information which you then passed on to Special Agent Gorham?

14   A.    Yes.

15   Q.    How did Frank get ahold of you?

16   A.    I had to get ahold of Frank, you know -- I forget exactly

17   how it went.  But I got in touch with my brother, Frank,

18   through a three-way call, because somebody was steady telling

19   me that my brother needed to talk to me about something.  So I

20   got in touch with my wife, and I had her to call Frank for me.

21   And when I called Frank, Frank had told me that Johnny had been

22   over to his house and told him to tell me if I didn't tell my

23   B-ass wife, to keep his name out of her mouth, that they were

24   going to find her in somebody's trunk dead.

25   Q.    And what did you do with that information?

1   A.    When I got that information, I got in touch with Agent

2   Gorham.  I told him that anything he wanted to know, I told

3   him, I said I wanted him to approach Johnny and tell him he

4   better not put a hand on my wife.  And anything they wanted to

5   know about him, get in touch with me and I'll tell them.

6   Q.    Did it cause you some concern for your wife?

7   A.    It caused me deep concern right now.  My wife is by

8   herself and she's steady getting threats.

9              MR. TRABOLD:  Nothing further, your Honor.

10             THE COURT:  You may cross.

11             MS. FRICK:  Thank you, your Honor.

12                        CROSS-EXAMINATION

13  BY MS. FRICK:

14  Q.    Mr. Crockett, my name is Sally Frick, I represent John

15  Cooley.  Let me ask you a couple questions about this plea

16  agreement you've talked about.  First of all, you entered into

17  a plea agreement back in July of last year, is that right?

18  A.    That's correct.

19  Q.    And you haven't been sentenced yet, have you?

20  A.    No.

21  Q.    You're waiting for this trial to be over before you can

22  be sentenced, is that right?

23  A.    Yes.

24  Q.    Because at that point in time the government will assess

25  your cooperation and make a recommendation to the judge, is

60

1  that right?

2  A.    Yes.

3  Q.    Who's the judge in your case?

4  A.    Judge Cohill.

5  Q.    Another judge in this courthouse, is that right?

6  A.    Yes.

7  Q.    Now, you told the ladies and gentlemen here today that

8  you were indicted with this Michael Colegrande and other

9  people, is that right?

10  A.    Yes.

11  Q.    Okay.  And it was alleged that from September, 2000 to

12  June, 2002, you were involved in a cocaine conspiracy with

13  those people, is that right?

14  A.    Yes.

15  Q.    Okay.  And it was supposed to be more than five kilos of

16  cocaine?

17  A.    Yes.

18  Q.    All right.  Now, your understanding after -- well, let me

19  step back.  You understand that in the federal system, because

20  you were indicted by a federal grand jury, that your sentence

21  would be determined by something called Sentencing Guidelines,

22  is that right?

23  A.    Yes.

24  Q.    And a number of factors go into those guidelines, is that

25  right?

1   A.    Would you repeat that.

2   Q.    Well, there's a number of factors that go into the

3   calculation of the guidelines, is that correct?

4   A.    Yes.

5   Q.    One of them would be how much drugs you're supposed to

6   have handled or been responsible for, is that right?

7   A.    I'm not really sure.

8   Q.    Okay.  Well, you don't know that part, is that right?

9   A.    I don't know.

10   Q.    Does your prior record score have something to do with

11   that?

12   A.    Yes.

13   Q.    Now, you've told us that you have two prior drug

14   convictions, is that right?

15   A.    Yes.

16   Q.    Both in state court?

17   A.    Yes.

18   Q.    And, as a matter fact, that's why you were in jail and

19   getting out of jail in September of 1999, is that right?

20   A.    That's correct.

21   Q.    You had gone to jail I guess sometime in '97, is that

22   correct?

23   A.    Yes.

24   Q.    Okay.  So the fact that you had two prior drug

25   convictions counts in calculating the Sentencing Guidelines,

1   which would give you a range of sentence in your case here in

2   this court, is that right?

3   A.    Yes.

4   Q.    Okay.  Now, that's the reason that your Sentencing

5   Guidelines are, as Mr. Trabold told you, 262 to 327 months, is

6   that right?

7   A.    Yes.

8   Q.    And is that because you are a career offender?

9   A.    I don't know if I'm classified as a career offender or

10  not because I didn't have any weapon or anything at the time.

11  Q.    Okay.  But it's your understanding that the guideline

12  range right now, which is the range that Judge Cohill would

13  have to sentence you to, would be 262 to 327 months, is that

14  right?

15  A.    That's correct.

16  Q.    You received the presentence investigation report that

17  did that calculation, is that right?

18  A.    Yes.

19  Q.    Now, do you also understand that contained in your plea

20  agreement is a provision that the government at the time of

21  sentencing and for cooperation that has been completed, will

22  make a motion pursuant to Section 5K of the Sentencing

23  Guidelines, and 18 U.S.C., which is the Criminal Code, 3553,

24  making known to Judge Cohill what it is that you've done for

25  the government in testifying here today?

63

1    A.    Yes.

2    Q.    And do you also understand that to mean that if the

3    government files that motion on your behalf, they will be

4    asking Judge Cohill to ignore the Sentencing Guideline range of

5    262 to 327 months and sentence you to a lower sentence, is that

6    right?

7    A.    I know they will make a recommendation, I don't know what

8    the judge will do, though.

9    Q.    Okay, I understand that.  So your plea agreement says

10   only that once you have testified here today, which is what

11   your cooperation is about, is that right?

12   A.    Yes.

13   Q.    The government will file a motion pursuant to 5K, tell

14   Judge Cohill what you've done, is that right?

15   A.    Right.

16   Q.    And then the judge will make a determination how much, if

17   any, below the 262 months you're going to get, is that right?

18   A.    That will be a determination, but everything is up to the

19   judge and nothing was promised.

20   Q.    I understand that.  But what is promised is that if you

21   cooperate, the government is going to file that motion, is that

22   right?

23   A.    Yes.

24   Q.    Okay.  And the government is the only one that can file

25   the motion, aren't they?

64

1    A.    Yes.

2    Q.    Your lawyer can't file it, can he?

3    A.    I don't know, I never been in federal court before.

4    Q.    All right.  So as you sit here today, you're looking at

5    262 months, at least, is that right?

6    A.    I guess.

7    Q.    What's the most amount of time you've ever done in jail?

8    A.    Three-and-a-half years.

9    Q.    What you did at Waymart, is that right?

10   A.    Yes.

11   Q.    So 262 months is over 20 years, is that right?

12   A.    Yes.

13   Q.    That's a long time?

14   A.    Yes, it is.

15   Q.    You expect that you're going to get less than that, don't

16   you?

17   A.    I expect the judge to do whatever he feels like he can do

18   because I got caught with drugs.

19   Q.    But you also expect the government to file a motion and

20   the government and your attorney to make a representation as

21   what you've done for the government, is that correct?

22   A.    I expect them to file a motion.

23   Q.    Okay.  And that's -- strike that.  Now, you've talked to

24   Special Agent Gorham and Trooper Weindorf on a number of

25   occasions, is that right?

65

```
 1   A.     Yes.

 2   Q.     Do you remember how many times?

 3   A.     No.

 4   Q.     Would it be nine times, would that sound about right?

 5   A.     I couldn't say, it's been over a 10 or 12 month period.

 6   Q.     Well, as a matter of fact, Mr. Crockett, didn't you first

 7   talk to the agents back in December of 2001?

 8   A.     Not pertaining to this case, no.

 9   Q.     You didn't speak to Agent Gorham on December 19th of

10   2001, and tell him that you stopped hanging out with John

11   Cooley because your association with Cooley had caused people

12   to assume that you were selling cocaine?

13   A.     Yeah, I did tell him that.

14   Q.     You also told Agent Gorham that you had hadn't sold any

15   drugs?

16   A.     Yes, I did.

17   Q.     And that you could probably name some of the people

18   providing information to law enforcement?

19   A.     Say that again?

20   Q.     Crockett advised he could probably name some of the

21   people providing information to law enforcement?

22   A.     At that time?

23   Q.     Yes.

24   A.     I don't remember.

25   Q.     Okay.  You don't remember telling them that?
```

66

1   A.    I don't recall that part.

2   Q.    But when you met, I guess this is a phone call with Agent

3   Gorham, he called you, is that right?

4   A.    He called me before.

5   Q.    That was late in 2001, is that right?

6   A.    Yes.

7   Q.    Now, that's before you got indicted and arrested on the

8   case that you're charged with here in this court, is that

9   correct?

10  A.    Yes.

11  Q.    Okay.  And you told him you weren't selling drugs, is

12  that right?

13  A.    Exactly.

14  Q.    That was a lie, wasn't it?

15  A.    I wasn't selling drugs then.

16  Q.    But you were indicted early in 2002 for participating in

17  a conspiracy that occurred from September of 2000 to June of

18  2002?

19  A.    Yes, but at the time that I was indicted, I hadn't been

20  selling no drugs for about six or seven months.

21  Q.    Okay.  Did you tell Agent Gorham that?

22  A.    Yes, I did.

23  Q.    Okay.  You told him you hadn't been selling drugs for six

24  or seven months?

25  A.    Right.

1    Q.    Okay.  Did you tell him you did sell drugs before that?

2    A.    Because I wasn't indicted, why would I tell him that.

3    Q.    Now, you then get arrested after you're indicted, is that

4    correct?

5    A.    Yes.

6    Q.    And that's when, sometime in 2002?

7    A.    June, 2002.

8    Q.    June of 2002, okay.  And it's after that that you then

9    have a number of meetings with Agent Gorham and Trooper

10   Weindorf from the state police, is that right?

11   A.    I started having contact with Agent Gorham after I was

12   incarcerated, and then after John Cooley had went and put out

13   threats on my wife and told my mother that he had already had

14   conversations with the FBI and with the Attorney General's

15   Office, stating that they would give him and his son, little

16   John, total immunity from all charges, but they had to charge

17   me.

18   Q.    Let me just interrupt you for a moment there, Mr.

19   Crockett.  So what you're telling us is that you didn't give

20   any statements that concerned Mr. Cooley's involvement, as you

21   talked here today, until there was the threat made on your wife

22   as related to you by your brother?

23           THE COURT:  Hang on a second, you're both talking

24   over each other, slow down just a little bit.  Go ahead.  Start

25   that all over again.

1    BY MS. FRICK:

2    Q.    What you're telling me, Mr. Crockett, it was after you

3    received the information from your brother and your wife about

4    the threat you told us about, about the trunk in the car, that

5    you had conversations with the agents, is that right?

6    A.    When I was incarcerated in June --

7    Q.    Excuse me, Mr. Crockett, was that true or not?

8    A.    Repeat the question then.

9    Q.    Is it your testimony here today that the first time,

10   other than the time I talked about, which is before you were

11   incarcerated and charged, the first time you talked to Agent

12   Gorham or Trooper Weindorf about Mr. Cooley, was after there

13   were the threats made about your wife about the trunk of the

14   car?

15   A.    Concerning John Cooley that was the first time I talked

16   to anyone about it.

17   Q.    So if Trooper Weindorf has a four-page document that he

18   interviewed you on October 31st of 2002, that would be wrong,

19   is that right?

20   A.    It happened in October when Johnny made the threats and

21   when he went to my mother telling her the lies.  That's when I

22   got in touch with them, I think it was the first week in

23   October.

24   Q.    Not October 31st?

25   A.    It was -- I think, I know it was in October.  Because I

1  had been incarcerated for about five and a half months by then.

2  Q.    And you don't recall having a long interview with Trooper

3  Weindorf on October 31st of 2002?

4  A.    As far as dates, I couldn't tell you, but I know I had a

5  conversation with him.

6  Q.    And after that you had that interview with him later in

7  November, November 18th of 2002, is that correct?

8  A.    Truthfully speaking, as far as the dates, I couldn't tell

9  you the dates.  But yeah, I did have conversations with them.

10          MS. FRICK:  Could I just have a moment, your Honor,

11  I want to check a date.

12          THE COURT:  Sure.

13  BY MS. FRICK:

14  Q.    Now, your testimony here today, Mr. Crockett, was that as

15  soon as you heard about the threat, you immediately called

16  Special Agent Gorham, is that right?

17  A.    Yes, I did.

18  Q.    Do you remember when that was?

19  A.    The date?

20  Q.    Yes.

21  A.    No, I just know it was in October.

22          MS. FRICK:  Could I approach the witness, your

23  Honor?

24          THE COURT:  You may.  You can approach without

25  requesting permission.

70

1      MS. FRICK:  Thank you.

2  BY MS. FRICK:

3  Q.    Would you take a look at that, please, let me direct your

4  attention, Mr. Crockett, passed the body of it -- what's the

5  date of transcription on that document?

6  A.    11/26/2002.

7  Q.    And at the bottom what does it say?

8      THE COURT:  Ms. Frick, if I can interject for a

9  second.  The record is not going to be clear because the record

10 at present doesn't reflect at all what that document is?

11     MS. FRICK:  I understand, your Honor, I'm going to

12 have him identify some things.

13     THE COURT:  All right.

14     THE WITNESS:  The one at the bottom is 11/23/02.

15 BY MS. FRICK:

16 Q.    Mr. Crockett, have you seen this document before?

17 A.    I'm not sure if I've have seen it or not.

18 Q.    Let me go back.  In preparation for trial in this case,

19 the agents had you review reports that they made based on their

20 interviews with you, is that right?

21 A.    Yes.

22 Q.    And you either corrected or amended or said that whatever

23 you said was correct in all of those, is that correct?

24 A.    Yes.

25 Q.    And they were the type of document that I showed you, is

71

1   that correct?

2   A.   Yes.

3   Q.   Was this document that I had showed you, was that one of

4   them?

5   A.   I seen one like that in there.

6   Q.   All right.  Let me show you --

7   A.   Pertaining to the threats that he made.

8   Q.   Let me show it to you again.  Do you recognize that as

9   being a report that was prepared and that you later reviewed

10  based on your conversation with Agent Gorham about the "threat

11  to your wife?"

12  A.   Yes, this is it.

13  Q.   Okay.  And the date on that was what again?

14  A.   11/26.  But that ain't the right date.

15  Q.   What's the date the investigation --

16  A.   11/23.

17  Q.   So it's your recollection that date is incorrect?

18  A.   When I talked to them about the threats, it was in the

19  month of October, 2002.

20  Q.   Okay.  And then it was after that that you had a meeting

21  with Trooper Weindorf and you first talked about Mr. Cooley, is

22  that right?

23  A.   Yes.

24  Q.   Now, once again, let me go back at the risk of repeating

25  myself.  In preparation for coming here today, you reviewed all

72

1  these reports, is that correct?

2  A.    Yes, I reviewed them.

3  Q.    Do you recall reviewing a report prepared by Trooper

4  Weindorf dated October 31st of 2002?

5  A.    I can't recall the dates.  I've been there 17 months, I

6  can't recall all the dates.  I know the months.  As far as a

7  specific date, I couldn't tell you.

8  Q.    Now, but your recollection is clear, you did not talk

9  about Mr. Cooley until the threat was made, is that right?

10  A.    Until the threat was made.  After he went and told my

11  mother that he made -- he had agreements with the FBI and with

12  the Attorney General's Office that they wasn't going to charge

13  him or his son with anything, but they were going to charge me.

14  And he also told them that I had a paid attorney and his name

15  was supposed to be Dennis Williams.  But, see, what it was

16  Johnny didn't know -- can I explain this to you, Johnny didn't

17  know --

18         MS. FRICK:  Your Honor, I don't think that is

19  responsive to my question, which is why I'm interrupting.

20         THE COURT:  Hang on.  Listen to the question.  If

21  there's some confusion, let's clear it up.  Repeat the question

22  and then respond to it.  Go ahead.

23  BY MS. FRICK:

24  Q.    It's clear in your mind, Mr. Crockett, that the interview

25  you had with Trooper Weindorf, when you first talked about Mr.

73

1   Cooley, was after the threats?

2   A.    After the threats.

3   Q.    Now, in any of the interviews that you gave to these two

4   gentlemen or any other law enforcement about Mr. Cooley, did

5   you tell them about the threat to your mother and about the

6   conversation about Mr. Cooley getting immunity and his son,

7   too, did you tell them that?

8   A.    I never said he threatened my mother.  I said Johnny

9   didn't know, he thought that me and my mother wasn't talking.

10  So Johnny went over to my mother's house and told her that I

11  had a paid attorney, which was supposed to be Dennis Williams.

12  That he had talked to the FBI and members of the Attorney

13  General's Office, he made agreements with them that they wasn't

14  going to charge him or his son with anything, but they were

15  going to charge me.  I called my mother because, like I said,

16  he didn't know that I was talking to my mother.  I called my

17  mother, she said Johnny just left here, she said why did you

18  lie to me.  I said lie to you about what.  You told me, you

19  didn't have no paid attorney.  I said, mom, I have a public

20  defender, his name is Dan Brabender.  I said you can call his

21  office or call down to the FBI building and find out.

22  Q.    Okay.  Let me interrupt you right there, Mr. Crockett,

23  did you tell the agents that about this whole thing you're

24  telling us?

25  A.    Yes, I told them.

74

1  Q.    Okay.  Once again, you reviewed, because the agents had

2  you do so, Mr. Trabold had you do so, all the statements that

3  were reduced to writing that you gave, is that right?

4  A.    I reviewed most of them.

5  Q.    Did you see what you've just told us about the

6  conversation with your mother in any of those?

7  A.    I don't know -- I don't know if that was in there or not.

8  Because we just went through a quick reviews.  I only had a

9  couple minutes each time to talk to them.

10 Q.    You definitely had the opportunity, at the request of the

11 government's lawyer and the agents, they asked you to make any

12 additions or corrections, is that right, that was the purpose

13 of the review?

14 A.    Yeah, that was purpose of the review.

15       THE COURT:  Ms. Frick, I apologize for interrupting,

16 but we've come to the end of our day.

17       MS. FRICK:  That's fine, your Honor.

18       THE COURT:  Let me just take a quick poll, how many

19 of you folks are traveling from parts outside of Erie County?

20       (Jurors indicate.)

21       THE COURT:  I thought there would be a large number.

22 And the weather is becoming increasingly undependable.  We're

23 going to stand in recess then.  Let me remind you what I told

24 you earlier today, and that is don't read anything, don't

25 listen to the news about this case.  Don't talk to family or