---

E X H I B I T "E"

---

```
 1                   P R O C E E D I N G S

 2

 3           (Whereupon, the proceedings began at 9:04 a.m., on

 4   Wednesday, December 3, 2003, in Judge's Chambers.)

 5

 6           THE COURT:  Mr. Trabold.

 7           MR. TRABOLD:  Your Honor, for the record, the

 8   government has provided this morning plea agreements, which Ms.

 9   Frick requested and which she obviously is entitled to, for

10   cross-examination purposes.  They would be plea agreements for

11   the following people.  Andre Henderson.  Albert Boyd.  Larry

12   Henry.  Curas Newsome.  Shannon Mathis.  Emire Rosendary.

13   Eric Tate.  Joseph Wayne.  Devoe Pickering.  And Rich Figueroa.

14   We are, just so the court's aware, there is no plea agreement

15   for Lamont Johnson, he just entered a straight guilty plea.  We

16   are in the process of trying to obtain the signed copy of Jose

17   Velasquez's plea agreement.  The clerk indicates they don't

18   have a signed copy in their file, in which case we'll turn over

19   the plea agreement we know is entered.  Part of the problem

20   with that is Mr. Velasquez pled as Marco Ramirez, which is his

21   alias.  We are still making efforts, I believe today we will

22   have the plea agreement for Raymond Simmons.  I mistakenly

23   received the wrong plea agreement when we made that request.  I

24   also turned over FBI 302 reports for interviews which were

25   conducted last night for Rich Figueroa, Shannon Mathis, Curas
```

4

1  Newsome, Eric Tate.  I believe that's it.  And those are all

2  one page reports.

3          THE COURT:  So you have all that?

4          MS. FRICK:  Yes, I received all that this morning.

5  Just as a practical matter, your Honor, we have finished the

6  cross-examination of this witness.  I would just request, maybe

7  at the time of the break, if the government is going to call

8  Figueroa next.  The only thing I had from him was a portion of

9  a report, now complete a 302, as well as the plea agreement.  I

10  would like a little bit of time to take a look at those,

11  obviously, before cross-examination.

12          MR. TRABOLD:  So the court's aware of the initial

13  plan, obviously, we'll finish with Mr. Crockett.  Then I plan

14  on calling Vito Casella, who is the custodian at SCI Waymart.

15  And then Frank Crockett.

16          THE COURT:  Ms. Frick, that will give you time.  One

17  other thing.  We have an alternate that has not shown up.  And

18  we have three alternates, my inclination is, if she doesn't

19  show up here like now, I would propose we just continue the

20  case.  If and when she comes in, tell here that the horse has

21  left the barn.  Does anyone have an objection to that --  I

22  don't see the need, three was probably overkill.  She wasn't on

23  the jury, she's an alternate.  Let's see if she's here, first

24  of all, that may cure the problem.  But I want to continue on

25  with this case.

1    MR. TRABOLD:  I would also like to put on the

2  record, your Honor, there was a 5K for Mr. Figueroa which we do

3  not have.  I will bring out the voluminous information, what I

4  understand to be his cooperation.  Essentially, amounts to him

5  cooperating against numerous people within Erie.  He also

6  cooperated against people in New York City, including providing

7  cooperation in a case known as the ballplayers out of New York

8  City, which was a large scale Dominican drug ring in New York

9  City, which was operated by former Dominican baseball players.

10  So counsel is aware, I just say this, I don't want to surprise

11  her, I don't have a 5K.  Mr. Figueroa, as referenced in his

12  presentence report, his sentencing range was 120 to 135.  After

13  receiving the 5K, Mr. Figueroa got 18 months.

14    THE COURT:  Eighteen months?

15    MR. TRABOLD:  Correct, from your Honor.

16    THE COURT:  That was me?

17    MR. TRABOLD:  Yes.  There also is a plea agreement

18  for Jamaal Smith's case, which occurred, I believe also around

19  '97, which also is archived, which we may not be able to get.

20  We will make every effort to get it.  If we can't get it, I

21  will certainly bring out whatever we can.  Obviously, we're not

22  trying to hide anything.

23    MS. FRICK:  I have a little bit of a problem with

24  not having a written 5K for Figueroa.

25    MR. TRABOLD:  I'm trying to take steps to get it.  I

1   don't know if it's archived or not.  The plea agreement wasn't

2   archived because we got the plea agreement.

3          MS. FRICK:  That was before the 5K.

4          THE COURT:  Well, put it this way.  All he can do is

5   best efforts to get it.  If you can't get it, you can't get it.

6   If you know the terms and conditions, beyond that there isn't

7   much we can do.

8          MR. TRABOLD:  Obviously, the most critical component

9   of the cross-examination would be the sentence reduction --

10         THE COURT:  What more would there be in the written

11  5K, I presume the written 5K motion is nothing more than a

12  recitation of the nature, scope and extent of his cooperation?

13         MR. TRABOLD:  Correct.

14         THE COURT:  Let's do this, we know you're hunting

15  for it, we'll talk about the logistics of it later, let's get

16  out there and get started.

17         (Whereupon, the proceedings recessed at 9:13 a.m.,

18  in Judge's Chambers; and reconvened at 9:15 a.m., in

19  Courtroom C as follows:)

20         THE COURT:  Ms. Frick.

21         MS. FRICK:  Thank you, your Honor.

22   JAMES E. CROCKETT, SR., GOVERNMENT WITNESS, PREVIOUSLY SWORN

23              (Continued) - CROSS-EXAMINATION

24  BY MS. FRICK:

25  Q.   Mr. Crockett, when we broke yesterday, we had been

1  talking about the number of times that you had been interviewed

2  by agents of the state police or the FBI, do you recall that?

3  A.    Yes.

4  Q.    And I neglected to mention, but you also testified under

5  oath before a grand jury last November, is that correct?

6  A.    Yes.

7  Q.    So, in addition to all the statements that you gave, you

8  appeared before a number of citizens known as a grand jury and

9  testified about some of the things that you talked about here

10  yesterday, is that right?

11  A.    Yes, it is.

12  Q.    Now, in all of those times that you gave information and

13  testified, not once did you ever mention what you told us here

14  yesterday about Mr. Cooley talking to your mother, is that

15  right?

16  A.    I'm not really sure, but Mr. Cooley knows.

17  Q.    Did you, I'm focused on you right now, did you ever tell

18  the agents or the folks in the grand jury about the phone call

19  to your mom?

20  A.    It wasn't a phone call, he went to my mother's house.

21  But I did tell the agents, I'm not sure if I told the grand

22  jury that or not.

23  Q.    Okay.  So you told the agents, is that right?

24  A.    Yes, I did.

25  Q.    If you told the agents, presumably they would have put

8

1   that in their reports, is that right?

2   A.   Right.

3           MR. TRABOLD:  Objection, your Honor, he can't

4   possibly know what an agent would do with the information

5   provided.

6           THE COURT:  Sustained.

7           MS. FRICK:  Thank you, your Honor.

8   BY MS. FRICK:

9   Q.   Let me ask it this way, Mr. Crockett, did you review all

10  these reports?

11  A.   I reviewed most of them.

12  Q.   And, as a matter of fact, some of the reports have to do

13  with you reviewing previous reports and having the chance to

14  amend or correct anything, is that right?

15  A.   Yes, some of dates and things had to be changed.

16  Q.   Did you notice when you were reviewing any of those

17  reports, up to the time you testified yesterday, that there

18  wasn't anything in there about this visit by Mr. Cooley to your

19  mother?

20  A.   I really didn't notice it.

21  Q.   You didn't notice whether it was there or not there, is

22  that right?

23  A.   I didn't know whether it was there or not, I know I had

24  told them about it.

25  Q.   That was important to you, is that right?

9

1  A.    Very important to me.

2  Q.    And it was important because, as you've told these folks,

3  that was the reason you started talking about Mr. Cooley, is

4  that right?

5  A.    No, the main reason why I started talking about Mr.

6  Cooley was because he threatened to kill my wife.

7  Q.    Okay.

8  A.    That's why.

9  Q.    And your recollection -- let's go back again, is that

10  that happened in October, is that right?

11  A.    That's when I got in touch with the FBI, in the month of

12  October.

13  Q.    That's the first time you gave a complete statement, as

14  you considered it, about Mr. Cooley, is that right?

15  A.    Yes.

16  Q.    Now, you told us that your indictment and your conviction

17  is for a criminal conspiracy with persons by the name of

18  Colegrande and Licata, is that right?

19  A.    That's correct.

20  Q.    And that was in 2002, is that right?

21  A.    Yes.

22  Q.    Okay.  And you also told the agents and you told the

23  folks here yesterday, that you met this Mr. Colegrande when you

24  were in the halfway house, is that right?

25  A.    Yes.

1   Q.   Okay.  You started discussing cocaine with him then, is

2   that right?

3   A.   Yes, I did.

4   Q.   After you got out of the halfway house, you started

5   dealing with him?

6   A.   No, when I got out of the halfway house I started dealing

7   with John Cooley.

8   Q.   So you discussed all this with Mr. Colegrande, but you

9   didn't do anything with him, is that right?

10   A.   No, I didn't.

11   Q.   Until you were indicted?

12   A.   I didn't do anything with him until I think in the year

13   2002, before that it was all with John Cooley.

14   Q.   Okay.  Now, Mr. Trabold brought out that the conspiracy

15   that you pled guilty to was from September, 2000 to June, 2002,

16   is that right?

17   A.   I believe so.

18   Q.   Now, so you had these conversations with the agents in

19   October, 2002; November, 2002, and you testified at the grand

20   jury in November, 2002, also, is that right?

21   A.   Yes.

22   Q.   Okay.  Now, in all of those times you told about the

23   ounce quantity that you got from Mr. Cooley, is that right?

24   A.   Five ounces the first time, a kilo the second time.

25   Q.   Okay.  But at that point in time up through November,

11

1   2002, you never told the agents anything about three kilo

2   deals, did you?

3   A.    We talked about the one kilo deal, and then I remembered

4   the rest, and I came back to them and told them to come back

5   and see me, and I told them.  Mr. Cooley knows what he gave me.

6         MS. FRICK:  Your Honor, would you please direct the

7   witness to respond to the question only.

8         THE COURT:  I think he was responding to it, go

9   ahead.

10  BY MS. FRICK:

11  Q.    Mr. Crockett, would agree with me, then, the first time

12  you ever told the agents anything about multiple kilo deals

13  with Mr. Cooley wasn't until May of this year?

14  A.    I've been in the county jail for 17 months, so the exact

15  months I can't recall.  But I know exactly what was given to me

16  and when.

17  Q.    Mr. Crockett, I understand what you've testified to.  My

18  question has to do with when was the first time you revealed

19  this information?

20  A.    It was in October.

21  Q.    So your recollection is in October, the first time you

22  had a complete statement with the agents, you told them

23  everything?

24  A.    I told them what I could remember at that time.  As time

25  went on, I told them more.

12

1   Q.    As time went on, you've remembered more, is that right?

2   A.    Exactly.

3   Q.    As time went on and you were indicted, you remembered

4   more, is that right?

5   A.    This was even before the indictment.

6   Q.    Okay.  What did you tell them before the indictment?

7   A.    I said these things happened before the indictment.

8   Q.    I understand that, Mr. Crockett --

9   A.    I didn't tell them anything before the indictment.

10  Q.    After you were indicted, you started talking, is that

11  right?

12  A.    No, after October, the first week in October when he said

13  he was going to kill my wife, that's when I started talking to

14  him.

15  Q.    Now, October of 2002 is after you were indicted, is that

16  right?

17  A.    Yes.

18  Q.    May of 2003 is after you were indicted, is that right?

19  A.    Yes.

20  Q.    And that is the first time you talked about a multiple

21  kilo deal or two with Mr. Cooley, is that right?

22  A.    As I told you before -- I started talking to them in

23  October, I don't know if it was May or what month it was when I

24  told them about the three kilos.  But Mr. Cooley knows.

25  Q.    That is when you first remembered about three kilo deals?

1   A.   As I repeat, again, in October I talked to them the first

2   time, I told them about a kilo, one kilo deal.   As time went

3   on, I remembered about the others.   And I told them about the

4   three kilo deals.   Mr. Cooley knows.

5           MS. FRICK:   Excuse me, your Honor, I would ask that

6   you direct the witness just to answer the question.

7           THE COURT:   I think that's fair, just respond to the

8   question.   Go ahead.

9   BY MS. FRICK:

10  Q.   Now, you testified yesterday, Mr. Crockett, that when you

11  got the one kilo that you attribute getting from Mr. Cooley,

12  you took it to someone else's house, is that right?

13  A.   I took it to another place, I stashed it.

14  Q.   And you wouldn't tell these folks yesterday who that was,

15  is that right?

16  A.   I took it to a place and stashed it, not to nobody's

17  house.

18  Q.   Okay.   Where was that?

19  A.   To an area where nobody wouldn't know where it was.

20  Q.   Where was that?

21  A.   In a field.

22  Q.   So despite what you said yesterday, you did not take it

23  to someone else's house?

24  A.   I took it to on somebody else's property, I didn't take

25  it in their house because I don't want them to be indicted for

14

1  having cocaine in their house.

2  Q.    So you won't tell us who that is, is that right?

3  A.    What difference does that make.

4  Q.    Excuse me, will you tell us who that is?

5  A.    Where I took it to?

6  Q.    Yes.

7  A.    I took it over on his property.

8  Q.    Whose property?

9  A.    John Cooley's property.

10  Q.    Okay.  So, yesterday you wouldn't tell us who that was

11  because you didn't want to get them in trouble, is that right?

12  A.    I just didn't want to tell you where I was putting it at

13  because I didn't want to get nobody else in trouble.  I took it

14  back to the house up there by 21st Street, that yellow house,

15  and stashed it in the back.  The house that he sold it to Jose.

16  Q.    Okay.  But yesterday you had some reluctance about

17  telling us because you didn't want to get somebody else in

18  trouble?

19  A.    Well, evidently, you're saying that --

20  Q.    Who's this somebody else?

21  A.    The only one that's involved is me and John Cooley.

22  Q.    Did you tell the agents what you just told us?

23  A.    No, I told them that I stashed it, I didn't tell them

24  where I stashed it or whose house or whatever.

25  Q.    And they didn't press you on it,

15

1   right?

2   A.    No.

3   Q.    Today is the first time you ever told anybody that, is

4   that right?

5   A.    Because I didn't know I had to reveal where I put it at.

6   I didn't know that I was supposed to reveal where I stashed it.

7   Q.    Well --

8   A.    I just made sure I got it off my property so if they came

9   to my house, they wouldn't find it on my property.

10  Q.    So, in your mind, you could pick and choose what you

11  would reveal to the agents, then, is that right?

12  A.    No, that's not correct.

13  Q.    Well, you chose not to reveal that, is that right?

14  A.    I told the agents the truth, like I'm telling now.

15  Q.    But you didn't tell them that little piece of truth, is

16  that right?

17  A.    Ma'am, I'm here today to tell the truth.

18  Q.    Did you tell the agents that piece of truth?

19  A.    I don't recall.

20  Q.    You don't remember?

21  A.    I didn't tell them where I put it at, no.

22  Q.    That's my question?

23  A.    That's the answer.

24  Q.    Now, you told us yesterday about some information you had

25  about Raymond Simmons, is that right?

16

1   A.    Yes.

2   Q.    And, again, the first time you revealed that piece of

3   information was actually two days ago, is that right?

4   A.    That's when I recall it.

5   Q.    December 1st of 2003, is that right?

6   A.    Yes.

7   Q.    The day before you were to appear here as a witness, is

8   that right?

9   A.    Yes.

10  Q.    That's the first time you ever told the agents about your

11  conversation about Raymond Simmons, is that right?

12  A.    I really never thought it had anything to do with this

13  case at the time, so that's why I never said anything about it

14  before.

15  Q.    Well, the information that you provided had to do with

16  Mr. Cooley, didn't it?

17  A.    Yes, it did, Mr. Cooley knows what he told me.

18  Q.    Again, in your mind, you decided that didn't have

19  anything to do with this case, is that right?

20  A.    I hadn't talked with the agents in a while.  So things, I

21  started remembering other things, so I told them.  There's even

22  more things I remember that I could tell.

23  Q.    Well, before December 1st of this year, two days ago, you

24  were interviewed on October 29th, is that right?

25  A.    I guess.  I don't know what date it was.

1  Q.    At that point in time you reviewed previous statements

2  that you made that were recorded by the agents, is that right?

3  A.    Yes.

4  Q.    And you had the opportunity to correct and amend those

5  statements, is that right?

6  A.    We had a little bit of time together, but, you know, they

7  said they would correct it as we went along, as they left, you

8  know, they had a lot of people to talk to.

9  Q.    Well, when you wanted to call the agents about what you

10  heard from your brother, Frank Crockett, you didn't have any

11  trouble getting in touch with them, did you?

12  A.    No, because he was talking about killing my wife.

13  Q.    I understand that, Mr. Crockett.

14        THE COURT:  Let him finish, please, we're not going

15  to have a record here if you do that.  And one other thing, I

16  apologize for interrupting, my clerk tells me that there was a

17  request from the jury or some of the jurors as to whether you

18  can take notes.  The answer is yes, you can take notes.  Do

19  they have pads up there, Tim?

20        THE CLERK:  I'll get some from the jury room.

21        THE COURT:  All right.  Go on, Ms. Frick.

22  BY MS. FRICK:

23  Q.    My question simply, Mr. Crockett, is you took the

24  opportunity when you wanted to and made contact with the

25  agents, is that right?

1  A.    When I needed to get in touch with them, I would make a

2  phone call.

3  Q.    Was the only time you did that, you didn't do that to

4  tell them about three kilo deals or to tell them about Raymond

5  Simmons, did you?

6  A.    At the time the most important thing for me was to look

7  out for my wife's well-being.

8  Q.    I understand that.  But after that happened, you did not

9  again take the opportunity to provide the information that

10  you've told us about here today to those agents, is that right?

11  A.    Would you restate that question again.

12  Q.    After you called them about the supposed threat to your

13  wife, you never called them again, did you?

14  A.    Yeah, I talked to them again.  Matter of fact, I talked

15  to them the next day when they came to see me.

16  Q.    Did you call them to tell them you had additional

17  information?

18  A.    Yes, I did, I had additional information on John Cooley

19  and the things that we had done.

20  Q.    Okay.  So you were interviewed about six weeks ago, in

21  October of 2003, is that right?

22  A.    I believe so.

23  Q.    You looked at the reports that you had given previously,

24  as well as your grand jury testimony, is that right?

25  A.    I looked over some of the reports, not all of them.

1   Q.    But the information about Raymond Simmons, you didn't

2   give them at that time, is that right?

3   A.    Like I said before, the most important thing for me was

4   to make sure that my wife was all right, because he was still

5   on the streets.

6   Q.    Mr. Crockett, I'm talking about October of 2003, when you

7   were given the opportunity to review your reports and review

8   your grand jury testimony, did you take that opportunity to

9   tell about Raymond Simmons, to tell about where you stashed the

10   cocaine?

11   A.    No, not at the time.

12   Q.    Okay, that's all my question was.  Now, Mr. Crockett,

13   your plea agreement, which is Government Exhibit 1, that you

14   reviewed yesterday and the folks saw, deals with your plea to

15   the indictment at Criminal No. 02-15, is that right?

16   A.    I don't know what the criminal number is.

17           MS. FRICK:  Your Honor, may I show this to the

18   witness.

19           THE COURT:  Sure.

20   BY MS. FRICK:

21   Q.    Mr. Crockett, that's Government Exhibit 1.  And that

22   indicates the criminal number, could you read that out for the

23   jury, please?

24   A.    Criminal No. 02-15.

25   Q.    Okay.  Now, that's where you were indicted with these

20

1   other folks, Colegrande and Licato, is that right?

2   A.    Correct.

3   Q.    And that's what you pled guilty to, is that right?

4   A.    Yes.

5   Q.    That's what you'll be sentenced on, is that right?

6   A.    Yes.

7   Q.    A presentence report has been done and right now your

8   range is over a 20-year range, 262 to 327 months, is that

9   right?

10   A.    Yes.

11   Q.    That's where you hope that Judge Cohill will reduce that

12   sentence for you, is that right?

13   A.    Yes.

14   Q.    Significantly reduce that sentence, you hope, is that

15   right?

16   A.    Of course, I would hope that.

17   Q.    Sure.  Now, Mr. Crockett, that indictment doesn't

18   include, does it, any of the activities you talked about here

19   today with Mr. Cooley, is that right?

20   A.    Could you repeat that.

21   Q.    I said that indictment doesn't include any of the -- the

22   conspiracy doesn't include anything you did with Mr. Cooley, is

23   that right?

24   A.    No.

25   Q.    So everything you talked about here yesterday and today

21

1  that has to do with Mr. Cooley, you're not going to be

2  prosecuted for, is that right?

3  A.    No.

4  Q.    Is that correct?

5  A.    I'm not going to be prosecuted for this.

6  Q.    So the only thing you're going to be prosecuted for is

7  the indictment that you pled guilty to?

8  A.    Yes.

9  Q.    And that's contained in this plea agreement, Government

10 Exhibit 1, is that right?

11 A.    Yes.

12 Q.    So the multiple kilos, the multiple ounces that you

13 talked about with Mr. Cooley, you're getting a free ride, is

14 that right?

15 A.    No, I'm not getting no free ride.

16 Q.    You're not going to be sentenced on those, are you?

17 A.    I'm still not getting no free ride.

18 Q.    You're not being prosecuted, are you?

19 A.    No.

20 Q.    Now, Mr. Crockett, if you could look at the exhibit, I

21 placed it on the screen there, paragraph number, paragraph four

22 talks about at the time of sentencing, which, as we know, you

23 haven't been sentenced yet, it that right?

24 A.    That's right.

25 Q.    And your sentence won't happen until after you testified

22

1   here, is that right?

2   A.    As far as I know, the date hasn't been set yet.

3   Q.    Well, we could agree that you haven't been sentenced yet,

4   right?

5   A.    Yes.

6   Q.    Paragraph four deals with if your cooperation has been

7   completed or even within one year after you have been

8   sentenced, the government will, and I'm paraphrasing here, and

9   the court and jury can read paragraph four, it says that the

10  government will file a motion under 5K1 of the Sentencing

11  Guidelines.  It says also that you have no right to compel the

12  government to do that, it's purely in the government's

13  discretion and the decision to reduce the sentence below the

14  applicable guideline range or any mandatory minimum is solely

15  in the discretion of the district court, is that right?

16  A.    That's correct.

17  Q.    So it's in the discretion of the government to file the

18  motion on your behalf, is that right?

19  A.    That's what it says.

20  Q.    And it's in the discretion of the court to reduce your

21  sentence if the court feels it's appropriate, is that right?

22  A.    That's what it says.

23  Q.    Okay.  And your hope by testifying here today is that

24  your sentence is significantly reduced, is that right?

25  A.    Yes, that's correct.

23

1  Q.    And your expectation, also, is that you will never be

2  prosecuted and have not yet been prosecuted for anything you

3  did with Mr. Cooley, is that right?

4  A.    Yes.

5          MS. FRICK:  No other questions.

6          THE COURT:  Mr. Trabold, do you have any redirect?

7          MR. TRABOLD:  Just briefly, your Honor.

8                    REDIRECT EXAMINATION

9  BY MR. TRABOLD:

10 Q.    Mr. Crockett, I would direct your attention to on

11 Government's 1, we'll use the fancy TV thing -- page number

12 two, paragraph number five.  Can you see that up there?

13 A.    Yes.

14 Q.    And that says "he will," he meaning you, "will provide

15 all information and evidence within his knowledge or control

16 concerning the investigation.  All such information will be

17 full, complete, accurate and truthful.  The determination of

18 the United States Attorney as to the completeness, accuracy,

19 and the truthfulness of the information and evidence provided

20 shall be final and conclusive."  So it's your understanding

21 that the plea agreement that you have with the government

22 compels you to tell the truth?

23 A.    Exactly.

24 Q.    And the paragraph that counsel just went over with you, I

25 believe you testified that you know you have absolutely no

24

1  ability to compel either the government, the United States

2  Attorney, or the judge in this case, Judge Cohill, to do

3  anything?

4  A.    Yes, that's correct.

5  Q.    Meaning you can't go into court with your attorney and

6  say the government has to give me something?

7  A.    The government hasn't promised me anything.

8  Q.    I want to direct you to page five of the plea agreement,

9  paragraph number three.  Read along with me.  It says "if, at

10  any time, the United States Attorney determines that James

11  Edward Crockett has provided any information or evidence that

12  is not full, complete, accurate, and truthful, or that James

13  Edward Crockett has not provided assistance or testimony upon

14  request, the obligations of the United States Attorney under

15  this agreement are terminated.  In that event, the government

16  may prosecute James Edward Crockett on charges it has agreed to

17  dismiss or has dismissed, and it may use against James Edward

18  Crockett information and/or evidence obtained from him.  The

19  government may also prosecute James Edward Crockett for perjury

20  or obstruction of justice.  Any plea of guilty previously

21  entered will stand, however, and James Edward Crockett will not

22  have the right to withdrawal the plea of guilty by virtue of

23  his breach of this agreement."  Additionally, paragraph number

24  four says "this agreement does not preclude the government from

25  pursuing any civil or administrative remedies against James

25

1    Edward Crockett or his property."  So your understanding is if

2    you do not tell the truth, essentially, the weight of the world

3    is going come down on you based on the plea agreement?

4    A.    That's right.

5            MR. TRABOLD:  One moment, your Honor.    Nothing

6    further.

7            THE COURT:  Anything further?

8            MS. FRICK:  Very briefly, your Honor.

9                        RECROSS-EXAMINATION

10   BY MS. FRICK:

11   Q.    Mr. Crockett, you said you received no promise from the

12   government, is that right?

13   A.    Exactly.

14   Q.    Well, that's not entirely true, is it, this plea

15   agreement is a promise from the government, is it not?

16   A.    No, it don't guarantee you anything.

17   Q.    It doesn't guarantee a range of sentence, is that right?

18   A.    It doesn't guarantee anything.

19   Q.    Okay.  So, as far as you're concerned, this plea

20   agreement doesn't mean anything to you?

21   A.    It means something to me, but it don't, nobody said they

22   guaranteeing me anything.

23   Q.    Well, if you cooperate --

24   A.    If I cooperate, I'm telling the truth, like Mr. Cooley

25   knows -- so I know I told the truth, that's what I'm here for.

1  Q.    All right.  Mr. Crockett, look at page three, paragraph

2  two.  "Pursuant to Section 1B1.8 of the Sentencing Guidelines,

3  the United States Attorney will not use against James Edward

4  Crockett any information or evidence provided by him in the

5  course of his assistance in the investigation."  That's a

6  promise, isn't it?

7  A.    I guess some of it, I don't know.

8          THE COURT:  Keep your voice up, speak into the

9  microphone, sir.

10 BY MS. FRICK:

11 Q.    The next paragraph on there, paragraph three.  Prior to

12 sentencing, the United States will, orally or in writing,

13 recommend a three-point reduction in the level, is that right?

14 A.    That's what it says.

15 Q.    Okay.  And we've already gone over the next paragraph,

16 which is four, which talks about the government filing a motion

17 on your behalf if, in the discretion of the government, it's

18 determined that you provided substantial assistance.  That's

19 your understanding, is it not?

20 A.    Yes.

21 Q.    Okay.  So you're getting two things.  If the government

22 feels that you have cooperated fully, they will file this

23 motion, ask the judge to go below the 262 months, is that

24 correct?

25 A.    Correct.

27

1   Q.    And the government will also never use against you all

2   the information that you provided about Mr. Cooley and anything

3   else that didn't have to do with your indictment, is that

4   right?

5   A.    That's what it says.

6   Q.    All right.  Those are the promises the government made to

7   you, is that right?

8   A.    If you call them promises, yeah.

9           MS. FRICK:  Thank you.

10          MR. TRABOLD:  Nothing further, your Honor.

11          THE COURT:  You're excused, Mr. Crockett.

12          MR. TRABOLD:  Your Honor, the United States calls

13  Vito Casella.

14          THE CLERK:  Please raise your right hand.  Could you

15  state your name and spell it for the record?

16          THE WITNESS:  Vito Casella.  V-i-t-o, C-a-s-e-l-l-a.

17          VITO CASELLA, GOVERNMENT WITNESS, SWORN

18                  DIRECT EXAMINATION

19  BY MR. TRABOLD:

20  Q.    Sir, where are you employed?

21  A.    I'm employed at SCI Waymart by the Department of

22  Corrections of Pennsylvania.

23  Q.    Just so the jury is clear, the acronym SCI means --

24  A.    State Correctional Institute at Waymart.

25  Q.    Where is that located, sir?

1  A.   In Waymart, Pennsylvania.

2  Q.   Which is how far a drive from here, assuming good

3  weather?

4  A.   Approximately, seven hours.

5  Q.   And in what capacity -- what do you do there?

6  A.   I'm the inmate record manager.

7  Q.   And what are your duties as the inmate record manager?

8  A.   Multiple duties, actually.  But, basically, in charge of,

9  custodian of the inmate records, along with day-to-day records

10  that are part of our daily routine.  The inmate's legal file.

11  I'm in charge of release procedures, admissions, quite a few

12  different things.

13  Q.   And would it be fair to say, given the nature of what

14  you're doing, that a number of different records are kept in

15  the ordinary course of business?

16  A.   Multiple records are kept.

17  Q.   And I want to show you what I'm marking here as

18  Government Exhibit No. 2 -- your Honor, just for the record I'm

19  going to show the witness this whole pad, I'm just going to

20  mark the page that is really relevant to the case as

21  Government's 2.

22        THE COURT:  All right.

23  BY MR. TRABOLD:

24  Q.    I'm going to give you a moment here to take a look at

25  that whole thing, and then if you could, I have a page marked

29

1  as Government's 2.  First of all, identify what the whole

2  document or whole pad is?

3  A.     This is referred to as our yellow pad, which becomes part

4  on of our daily captain's reports.  Basically, it's a

5  chronology of what happened during the course of the day, any

6  incidents that may have happened, whether there was inmates

7  admitted, inmates released.  Accidents.  Any type of business

8  that went on during the day.  Incident reports, it's all

9  compiled on to this yellow pad, which then is put together as

10  part of the captain's report, which is circulated in the jail

11  the next day for the executive staff to review and becomes part

12  of the official record.

13  Q.     And who is it in the prison system, from a staff

14  perspective, that would write notes on the yellow pad you have

15  in front of you?

16  A.     Actually, it could be multiple people.  But normally it's

17  the sergeant on duty.  If the sergeant isn't there or being

18  relieved, it could be the lieutenant, it could actually be the

19  captain on duty.  Usually it's the sergeant, lieutenant or

20  captain.

21  Q.     And the yellow pad you have in front of you, which

22  contains Government's 2, what dates does that encompass?

23  A.     This is from 9/3/1999 through inclusive to 9/20/1999.

24  Q.     So September 3, '99 to September 20, '99?

25  A.     Correct.

30

1   Q.    And is that pad a record of the prison that's regularly

2   kept in the course of business?

3   A.    Has been forever.

4   Q.    And, in fact, in this case did you receive a call from

5   Trooper Weindorf to go retrieve that report?

6   A.    Correct.

7   Q.    And you, after some searching, were able to obviously

8   locate the report as it was held in the file?

9   A.    Yes, they're kept in archives.

10  Q.    Let me direct you to what I marked as Government's 2, and

11  then I'll take it back from you so we can put it on the screen.

12  Can you identify what Government's 2 is?

13  A.    Yes, I can.

14  Q.    What is it?

15  A.    It's the sheet for Tuesday, 9/7/1999, starting at the

16  0600 shift, which would be 6 o'clock in the morning.

17  Q.    Does that sheet, Government's 2, contain reference to an

18  inmate by the name of Crockett or James Crockett?

19  A.    Yes, it does.

20  Q.    Let me take it back from you, then you can look at it on

21  the screen.  Can you see that up there okay, sir?

22  A.    Yes, I can.

23  Q.    Can you read for the jury what is the entry marked at

24  0645?

25  A.    At 0645 it's noted that a John Cooley (friend) arrived to

31

1  pick up inmate released to a CCC referral.  The inmate was DD

2  9126 Crockett.

3  Q.    What's a CCC referral mean?

4  A.    Evidently Mr. Crockett was being released to a halfway

5  house, which is a community corrections center.

6  Q.    And CCC is community corrections center?

7  A.    (Witness nods head.)

8  Q.    And can you explain to the ladies and gentlemen of the

9  jury, based on your understanding and your experience, what is

10  the procedure at SCI Waymart when someone comes to pick up an

11  inmate, what does the person picking up the inmate who's being

12  released, what do they have to do?

13  A.    They report to our sallyport area.  Address security of

14  who they are and what they're there for.  From there they're

15  directed into our front gate area.  At that time they're asked

16  to produce identification.  Again, it's noted on the pad who

17  they are.  That they're to pick up whoever.  We determine if

18  it's a legitimate pickup and process them out.

19  Q.    And the person picking up has to show ID?

20  A.    Correct.

21  Q.    What percentage of the inmates, if you know, what

22  percentage of the inmates, approximately, are picked up by an

23  individual rather than let's say go on a bus when they're

24  released?

25  A.    Less than 20 percent.

32

1          MR. TRABOLD:  Judge, I would ask that Government's
2    Exhibit 2 be admitted.

3          THE COURT:  Any objection?

4          MS. FRICK:  No objection.

5          THE COURT:  It's admitted.

6          MR. TRABOLD:  Nothing further.

7          THE COURT:  Any cross?

8          MS. FRICK:  No, your Honor.

9          THE COURT:  All right, thank you, sir, you're
10   excused.

11         MR. TRABOLD:  Your Honor, just for the record, may
12   Mr. Casella take this pad, minus Government's 2, back to SCI
13   Waymart with him?

14         THE COURT:  He may.

15         MR. TRABOLD:  May the witness be excused, your
16   Honor.

17         THE COURT:  He is.

18         THE WITNESS:  Thank you.

19         MR. TRABOLD:  Your Honor, the United States calls
20   Frank Crockett.

21         THE COURT:  Mr. Crockett, stand in front of the
22   clerk's desk here, he'll swear you in.

23         THE CLERK:  Please raise your right hand.  Sir,
24   state your name fully and spell it for the record?

25         THE WITNESS:  Frank Crockett.  F-r-a-n-k,

1    C-r-o-c-k-e-t-t.

2              FRANK CROCKETT, GOVERNMENT WITNESS, SWORN

3                      DIRECT EXAMINATION

4    BY MR. TRABOLD:

5    Q.    Sir, how old are you?

6    A.    Fifty.

7    Q.    How far did you go in school?

8    A.    Eleventh.

9    Q.    Do you have any pending criminal cases or convictions or

10   anything you're waiting to be sentenced on at all?

11   A.    No.

12   Q.    You're not in the criminal justice system at all at this

13   point in time?

14   A.    No, sir.

15             THE COURT:  Pull your chair in, sir, speak directly

16   into the microphone.

17   BY MR. TRABOLD:

18   Q.    Have you been promised anything in exchange for your

19   testimony?

20   A.    No.

21   Q.    Have you asked for anything in exchange for your

22   testimony?

23   A.    No, I wouldn't even be here if it wasn't asked for the

24   fact that John asked me to deliver the message.

25   Q.    Are you expecting to get anything in exchange for