---

E  X  H  I  B  I  T  "F"

---

Form DB-2
Rev. 11/81

**THE DISCIPLINARY BOARD OF THE SUPREME COURT OF PENNSYLVANIA**

Suite 400, Union Trust Building
501 Grant Street
Pittsburgh, Pennsylvania 15219

_11-26-03_
Date Sent

**COMPLAINT INFORMATION FORM**

(Please Type or Print)

Date: _11-15-03_

A. **COMPLAINANT:**

Mr./Mrs.
Your Name: Miss/Ms. _Cooley Jr    John         Henry      c/o_
                      (Last)       (First)        (MI)       (Age)

Address: _P.O. Box_ _____ _Mayville_ _____ _N.Y._ _14757_
          (Street)              (City)        (State)   (Zip Code)

Telephone: Home: _814-459-0154_ ; Work: _____
                  (Area Code/Number)          (Area Code/Number)

B. **ATTORNEY COMPLAINED OF:**

Name: _Frick          Sally     A._               County: _____
       (Last)          (First)   (MI)

Office Address: _1601 Frick Building    Pittsburgh    PA.    15219_
                 (Street)                (City)       (State)  (Zip Code)

Telephone: Office: _412-261-3340_ ; Other: _412-261-9811_
                    (Area Code/Number)        (Area Code/Number)

C. **PRIOR COMPLAINTS CONCERNING THIS MATTER OR THIS ATTORNEY:**

Have you previously filed a complaint concerning this matter or this attorney with the Disciplinary Board, a Bar Association or its Fee Dispute Committee, any District Justice, Court, District Attorney or any other agency or office? ☐ YES ☒NO. If so, please identify the agency and specify the date and nature of your complaint and the action taken by the agency: _____
_____

D. **INSTRUCTIONS:**

A written and signed statement of the facts must be filed with the Disciplinary Board before your complaint can be considered. Therefore, on the reverse side of this form, under STATEMENT OF COMPLAINT, please fully and completely set forth all of the facts and circumstances of your complaint. PLEASE BE SPECIFIC, referring to relevant dates, contacts you made with the attorney, the fee arrangement, amounts paid to the attorney and when, services to be performed, the names and addresses of other individuals involved in the legal matter, EXACTLY WHAT CONDUCT YOU BELIEVE IS UNETHICAL OR ILLEGAL, etc.

PLEASE ATTACH COPIES OF ALL CORRESPONDENCE AND/OR DOCUMENTS RELATING TO YOUR CASE. If you send original documents and wish them to be returned to you, please check here ☐. If you have not attached any documentation, please explain why: _____
_____

Memorandum of Complaint
for Attorney Malpractice
and the rendering of Ineffective Assistance
of Counsel

- Against -

Sally Frick
Attorney at Law
1601 Frick Building Pittsburgh, PA 15219 (412) 261-3340
Submitted and Sworn to By:

John Cooley

Contact: Care of Dorothy Cooley 1978 Prospect Ave Erie, Pa 16501 (814) 899-4094

    I, John Cooley execute this complaint against one Sally Frick, Attorney at Law for her ineffective assistance as my counsel, Malpractice and unethical conduct, in a matter she was retained (fully) by me to handle, as follows:

1. I am facing a serious matter that concerns my life, liberty and property pursuant to groundless accusations being brought against me by the United States Government based on hearsay and perjured testimony. As a result of these accusations and hearsay statements made by the prosecutor, which are false I was detained, put in jail without

a trial or full evidentiary hearing
since December 2002 and denied release or bail.

---

2. My initial counsel was disqualified
and Sally Frick was hired in January
2003. One-third of her retainer, $10,000.00
dollars, was paid to her then. I made
it clear the first order of business was
to vacate or revoke the groundless detention
I was then subjected to, being held at
the Erie, Pa County Jail, which is near
my family, friends and support group. Sally
Frick agreed she would make revoking the
detention order her first matter of business
and provide me with the best defense
against the accusations being made against me.
I then did not hear from Sally Frick for over
6 weeks.

3. Sally Frick asked me if I knew of
any witnesses that could refute the hearsay
allegations being brought against me causing
my detainer. I provided Sally Frick with
the complete names and contact information
of four material witnesses that would give
sworn testimony in open court directly
rebutting the hearsay allegations.

4. Sally Frick never contacted one of these witnesses for the upcoming Title 18 USC Sec. 3145 (b) Motion to revoke detention order being brought before the district court judge.

5. Sally Frick was given all of the telephone numbers and addresses of all of these witnesses and never sent them a letter or contacted them by telephone in order to arrange for their testimony. This contact information was given to Sally Frick by me and confirmed by my wife, Darlene Cooley.

6. Two of the witnesses contacted Sally Frick so they could make arrangements to testify at the upcoming motion to revoke the detention order. Each of the witnesses left their return contact information with Sally Frick's secretary at Sally Frick's office. Sally Frick never returned the witnesses telephone calls or got back to them in any way.

7. I, John Cooley contacted Sally Frick to inquire about arranging for the four witnesses. Sally Frick stated to me and to my wife, mother and sister that Sally Frick needed Seven hundred and Fifty dollars ($750.00) to retain

3

7. (Cont.) a Private Investigator in order to contact
the witnesses. My Mother, Dorothy Cooley
sent this $750.00 to Sally Frick in order
to retain the Private investigator to contact
the witnesses and arrange for their testimony
at the upcoming hearing on the Motion to
revoke the detention order before the district Court
Judge (United States District Court Western District of
Pennsylvania)

8. I, John Cooley then after reasonable time
called and talked to _all_ of the Four witnesses
who said that neither Sally Frick or a
Private Investigator attempted to contact them.
The witnesses then called my Family who
in turn informed Sally Frick that the
witnesses were never contacted by Sally Frick
or her allegedly retained Private Investigator.

9. The revocation of detention hearing was held
some time in March-April of this year. I
was present at the hearing. Sally Frick
was not prepared at all to argue the Motion
at this hearing. Sally Frick brought _NO_
witnesses and made _NO_ proffers and presented
_No_ new evidence to rebut the prosecutor's
hearsay allegations that this detention

4

9.(cont) is based on.

10. Sally Frick offered No ~~proffer~~ Proper, no testimony and no evidence whatsoever to defeat any rebuttable presumption that may exist causing this detention although overwhelming evidence exists to win against either a preponderance or a clear and convincing evidentiary standard pursuant to Title 18 USC Sec. 3142 (F).

11. No Private Investigator showed up at this hearing to revoke this erroneous detention and Sally Frick provided us, ie me or my family with no evidence demonstrating she ever retained a Private Investigator.

12. When Sally Frick was asked what happened to the witnesses she threw her hands up in the air in the court room and said "I don't know." She should have known and was given ample opportunity to be informed and do her job.

13. Despite this poor showing and before the hearing to Revoke the detention order Sally Frick called my wife and said she wanted the remainder of her retainer.

5

14. My Wife, paid Sally Frick an additional $15,000.00 previous to the Revocation of Detention hearing in April of this year.

15. After the hearing, which we lost, even though the Judge has asserted that the Government has an extremely weak case and that he "hopes this does not go to trial" Sally Frick told me that the Assistant U.S. Attorney wanted to "talk to" me. I was ushered into a back-room outside the court-room.

16. Upon my arrival to this back-room there were present Two (2) Federal Agents, Two (2) City detectives and One (1) State Agent all of whom were active in the investigation against me and NO Assistant U.S. Attorney as Sally Frick had represented to me.

17. Sally Frick wrote up a "Proffer" and handed it to me, John Cooley to read. She, Sally Frick lied in the "Proffer" with a materially false, hugely significant false accusation. I, John Cooley said that

6

17.(Cont) and told Sally Frick that this particular statement was a lie and never happened and although the other statements in the proffer were accurate but for this huge lie I could not accept the proffer.

18. Sally Frick told me, John Codey that she wanted me to sign the proffer so she could get my statement about some other things that were serious, concerning others, in the record in order to get me out of jail by breaking the detention, which of course should have been resolved by simply providing the testimony and evidence to the court at the revocation of detention hearing we just had.

19. Sally Frick said to me if I did not sign the proffer then we could not let the court know or the investigators know some of the things that happened in the past that would help me. I signed the proffer under duress and then reversed my position and told Sally Frick not to use the proffer because it contained a materially false statement.

20. The fact that Sally Frick pushed a proffer on

7

20.(cont.) one me containing a materially false statement that I cannot sign or agree to has stopped or prevented me, John Cooley, from getting a 5k letter or $300 lesser sentence offer, which would elliminate the possibility of facing accusations and false charges that could result in a life sentence and instead expose me to a sentence of as little as <u>one year</u> in my situation.

21. Sally Frick has attempted to induce me to lie and allowed the prosecution's agents to threaten me with a life-term with the bribe of a potential reduction to as little as one year in jail instead of properly defending me and revoking the detention.

22. At this aforesaid meeting with the aforesaid investigators just after Sally Frick's deliberate and miserably poor showing at the hearing to revoke, the State Trooper, Mark Weindorf told me, "this is your final chance to get a 5k letter; do you know what that means?" I told him I knew what that meant (as set forth herein in paragraph 20 <u>Supra</u>.) State Trooper, Mark Weindorf then pushed the proffer across the table over to me, John Cooley.

8

22.(Cont.) I, John Cooley then pushed the proffer back to State Trooper, Mark Weindorf and said "It contains a lie. I can't sign it."

23. Subsequent to this a newspaper article appeared, which I have, that reports that: Mark Weendorf, while he was a probation officer was caught lying and perjuring himself and got the state sued and settled with the victim for $50,000.00. Sally Frick was asked to check this out.

24. Sally Frick claimed that the Mark Weindorf who perjured himself as a probation officer was not the same Mark Weindorf active in the false accusations being made against me. My family checked this out and discovered that it is the same Mark Weindorf who perjured himself as a probation officer that is actively involved in the false accusations being brought against me, as State Trooper Mark Weindorf.

25. After I refused Mark Weindorf's invitation to sign the proffer containing the false statement at the aforesaid meeting at which Sally Frick was present,

9

25.(Cont.) everyone walked out and Sally Frick
said "I will talk to him (Mark Weindorf)
later."

26. After the aforesaid meeting the U.S. Marshalls
refused me transport back to the jail (I
was now (and am now) being detained at
the Chautauqua County Jail, Mayville,
New York which takes over an hour to
get to from the court.) The Marshall's claimed
it was over-time and the state Narcotics
officers said they were going to take me
any way. I was then transported back to
jail by these state Narcotics officers, and Sally
Frick, I found out later, knew about this.

27. These are the same Pennsylvania State
Narcotics officers that gave false testimony
at the previous detention hearing(s) claiming
I made threats to several people who are
all in jail and were not at the hearing,
which caused this erroneous detention.

28. These same State Narcotics Officers purportedly
testified against me at the Grand Jury
causing the false accusations to be made

10

28. (Cont.) against me by indictment.

29. These same State Narcotics Officers questioned me without the presence of my attorney while they transported me to the Chautauqua County Jail at Mayville, New York after Sally Frick lost the motion to revoke the detention through ineffective assistance of counsel and shear deliberate lack of preparation and this meeting with Five investigators; where all used duress to attempt to force me to lie on a proffer in order for me to extricate myself from what amounts to a false imprisonment and false accusations.

30. Subsequently I followed this up with a notarized letter sent registered mail to Sally Frick demanding that the signed proffer never be used, that it contains a lie and that it was signed only under duress and complaining of her poor performance.

31. Shortly thereafter I, John Cooley, instructed Sally Frick to bring an appeal under title of detention 18 usc sec 3145 (c) to the 3RD Circuit Court of Appeals. Sally Frick claimed that

11

31. (cont.) "The Judge had to grant an order so that she could get the transcripts to bring the appeal", that this had to be done before the motion could be filed but that she would do this. To this day she has not brought this motion, nor did she get any transcripts. Moreover, you do not need a court order to get the hearing transcripts.

32. My wife requested the transcripts from Sally Frick for the last two hearings concerning this detention. When my wife made this request Sally Frick responded, "Does John know the transcripts cost money?" Each of the hearings are only a half hour long, and the cost of the transcripts would be neglegible.

33. Sally Frick has had me pay for transcripts I already had.

34. I, John Cooley have told Sally Frick that I want a copy of all my records that she has pertaining to the matter she is supposed to be representing me for. I have asked for these records several times and my family has confirmed this request yet Sally Frick has failed to provide me with copies of my records in her possession.

35. Sally Frick told me that she had a trial date set for September 16, 2003.

36. Two weeks before this trial date, by telephone I, John Cooley and Sally Frick agreed that Sally Frick would be up to see me. Sally Frick never showed up.

37. I called Sally Frick on the 16th of September and only then, on the 16th of September did Sally Frick send me a notice that the trial was postponed.

38. Several times after this postponment I, John Cooley attempted to contact Sally Frick with very important information that would help the case. I left messages at Sally Frick's office to that effect. Despite this Sally Frick never attempted to contact me or arrange for a telephone call or come to see me about this exonerating information.

39. Sally Frick did not come to see me until Federal Agents came to the jail to see me.

40. I was informed that a new trial date was scheduled for the 1st of December, 2003.

13

41. Sally Frick has given no indication that she has done anything for my defense although I could face serious time if I cannot properly defend against the charges I have been accused of; up to life imprisonment.

42. Sally Frick has showed up at the jail recently on November 11, 2003 to see me. Sally Frick showed up without notice bringing with her a "plea agreement" dated October 28, 2003 on November 11, 2003. Sally Frick read me this plea agreement, gave it to me and asked me to read it and make up my mind to accept a 14-20 year sentence or stand-trial on December 1. She said that I could get life in prison if we lost at trial and that I had to decide whether or not to take this plea of 14-20 years in prison or stand trial for a potential life sentence by November 13, 2003, two days. I told her "No."

43. Afterwards a guard came into the "pod" where I am "housed" and gave me a message to call Sally Frick.

14

44. I called Sally Frick who told me she had another agreement for 11.5-20 years or stand trial facing life and that I had until the next day to decide.

45. I got back to her and told her "no". After that she told me she would be out of town running around and when she hears something she'll get back to me. Supposedly trial is set for December 1, 2003.

46. No release form was ever given to me by Sally Frick to release the information to her from the initial attorney I had defending me in December of 2002. That Attorney was disqualified on a pretense and I have been denied my counsel of choice, Dennis Williams.

47. Sally Frick has done nothing but take my money and left me in a bad situation. She has made no effort at defense or accumulating information, evidence, testimony and witnesses to defeat the false accusations being brought against me. She has deposed no one to my knowledge or information.

15

48. Sally Frick interviewed me initially at the end of December 2002 for about 45 minutes. She has only come to the jail at Mayville, New York twice. I only saw her three or four times this year, maybe for a total of only a few hours -tops. She has only spoken to me on the telephone about six times this year for under fifteen minutes each time. I have called her office forty or fifty times and left messages or got hung-up on with no contact.

49. I spoke to Sally Frick's secretary several times as has my sister Jodie. Sally Frick's secretary has represented to both my sister, Jodie and me, "I don't know what's going on with Sally, all her clients are calling in and are upset with her." This was about two months ago in September.

50. Virtually all of the contact I have had with Sally Frick about this matter has been an effort by her to force me to plead guilty to a crime I did not commit. Sally Frick has used duress and falsehood in order to force this on me and avoid properly defending me.

16

I, John Cooley, do hereby execute this statement of complaint at malpractice, ineffective assistance of counsel and unethical conduct against Sally Frick, Attorney at-Law licensed under the State of Pennsylvania and admitted to practice in the United States District Court and assert that the statement is made to the best of my knowlege, information and belief and that it is true, correct and complete

John Cooley, Complaintant

United States of America

Sworn to on this 20th day of NOVEMBER, 2003

Notary Public

County of Chautauqua

State of New York

DANIEL F. QUAGLIANA
NOTARY PUBLIC, STATE OF NEW YORK
No. 01QU6068958
QUALIFIED IN CHAUTAUQUA COUNTY
MY COMMISSION EXPIRES JAN. 14, 20 06

Current Mailing Address:

John H. Cooley, Jr.

c/o P.O. Box 190

Mayville, N.Y. 14757

Indicate "Legal Mail" on Correspondence

Paul J. Killion
Chief Disciplinary Counsel

aul J. Burgoyne
Deputy Chief Disciplinary Counsel

DISTRICT IV OFFICE
Suite 400
Union Trust Building
501 Grant Street
Pittsburgh, PA 15219-4407
(412) 565-3173
FAX (412) 565-7620

THE DISCIPLINARY BOARD
OF THE
SUPREME COURT OF PENNSYLVANIA



OFFICE OF DISCIPLINARY COUNSEL

Disciplinary Counsel-in-Charge
Angelea Allen Mitas

Disciplinary Counsel
Mark G. Weitzman
Samuel F. Napoli
Cory John Cirelli
David M. Lame
Susan N. Dobbins
Richard Steven Levine

December 4, 2003

*I got this letter 12-19-03*
*Erie county Jail.*

John Henry Cooley, Jr.
c/o Dorothy Cooley
1978 Prospect Avenue
Erie, PA 16501

    Re:  Complaint Against Sally A. Frick, Esquire
         File Reference #C4-03-1433

Dear Mr. Cooley:

    We are continuing our investigation into your complaint.  In
order for us to better understand your complaint, please answer
the following questions and/or provide the information requested
within twenty (20) days of the date of this letter.


    1.   Why were you being detained?

    2.   What criminal charges were filed against you?

    3.   Did Ms. Frick provide you with a written fee agreement
or other document which stated the amount of her fee?  If so,
please provide this office with a copy of that document. *yes*

    4.   If there is no written fee agreement, what did Ms.
Frick tell you her fee would be for representing you?

    5.   What specifically did Ms. Frick agree to do for you? *get me*
*bail before I talk to Anyone, Take care of my case in court if I have to go, and PSI, sent,*
    6.   When did you provide Ms. Frick with the complete names
and contact information of your four witnesses for the detention
hearing? *The day I took her on as my lawyer*

    7.   What are the names of the witnesses? *Ricky Killman, Sharon Alexander,*
*Cory coleman, marcell Jones*
    8.   What are the names of the two witnesses who contacted
Ms. Frick about testifying at the hearing about the detention
order? *Ricky Killiams, marcell Jones*

John Henry Cooley, Jr.
Page Two
December 4, 2003

9.    When did you contact Ms. Frick about arranging for the four witnesses to testify? *several times she told me the the PI will take care of that*

10.    When did you pay Ms. Frick one-third of her $10,000 retainer? *Please check with Dorothy and Darlene cooley ; 814-899-4094  814-459-0154*

11.    When did your mother pay Ms. Frick the $750 for a private investigation? *my mother has the paper work*

12.    Why do you believe that you should not have been detained in jail pending your trial? *Because I did not threaten anyone And had not been around any of them for years*

13.    When did your wife pay Ms. Frick an additional $15,000 as you stated in your complaint? *Because she stated she wanted the rest of he money*

14.    How did Ms. Frick lie in the "proffer" as you alleged in your complaint? *she stated that I said Jose was my supplier I never stated that at any time it's not and was not true*

15.    What was the materially false accusation that she included in the "proffer"? *That Jose gave me drugs that stated went stopped me because he never did*

16.    If you have a copy of the "proffer" as prepared by Ms. Frick, please provide this office with a copy of that document. *no I don't she stated to M.A.W. that she did not give me a copy.*

17.    When did you sign the "proffer"? *The day of the meeting after court when they turned down bail*

18.    When did you tell Ms. Frick not to use the "proffer" because it contained a materially false statement? *The same day of court and told the police that was in the meeting the same.*

19.    How did Ms. Frick attempt to induce you to lie, as you alleged in your complaint? *So that I could tell them about a murder that took place years ago in erie on the west side that involved 2 guys from N.Y.*

20.    What is the letter that you reference in your complaint that Mr. Weindorf discussed with you?

21.    Please provide this office with a copy of the letter you sent to Ms. Frick by registered mail demanding that the signed proffer never be used. *I have that*

22.    When did you instruct Ms. Frick to bring an appeal under Title 18 U.S.C. §3145(c) and how did you do so? *by phone After my bail was turned down and I was able to contact her*

23.    When did your wife request from Ms. Frick the transcripts for the last two hearings concerning your detention and how did she do so? *Please check with my wife 814-459-0154*

24.    When did you request that Ms. Frick provide you with a copy of all of your records and how did you do so? *By phone, my wife, my sister Jodie, and my mother Dorothy Cooley.*

John Henry Cooley, Jr.
Page Three
December 4, 2003

    25. When did you call Ms. Frick about important information about your case? *I think it was back in Oct 03 please check with FBI they come to see me in N.Y.*

    26. When did Ms. Frick visit you in jail? *after I called her office and talked to her settory and told*

    27. How much has Ms. Frick been paid to represent you? *I see about FCI 25,000 + 750.00*

    28. Please provide this office with any other documents you have pertaining to Ms. Frick's representation of you.

    As soon as we have the requested information, we will be in a better position to determine the course of action this office should undertake.

    You are reminded of the confidentiality of this matter as previously explained to you.

    If you have any further questions, please contact me.

                Very truly yours,


                Mark G. Weitzman
                Disciplinary Counsel

MGW/mb

34

1   testifying?

2   A.    No.

3   Q.    How many times have you met with either myself, Special

4   Agent Gorham or Trooper Weindorf to prepare to testify in this

5   case?

6   A.    To prepare to testify?

7   Q.    Just to discuss what it is, to be interviewed by me,

8   essentially?

9   A.    Okay.   Three times.

10  Q.    And, in fact, you and I just met each other maybe two or

11  three weeks ago, maybe a little longer than that?

12  A.    Uh-huh.

13  Q.    Has the government told you what to say in this case?

14  A.    No.

15  Q.    Has the government forced you to say anything?

16  A.    No.

17  Q.    Have you been reminded during your interactions with law

18  enforcement of your obligation to tell the truth?

19  A.    Yes.

20  Q.    Mr. Crockett, what is your understanding of what could

21  happen to you if you do not tell the truth when you're under

22  oath?

23  A.    That I would be committing perjury.

24  Q.    You could obviously experience some negative

25  ramifications from committing perjury?

35

1    A.    That's correct.

2    Q.    Mr. Crockett, I want to talk to you about a little bit of

3    your prior criminal record.  Am I correct that in January of

4    1987, you had a theft by unlawful taking charge for which you

5    did 6 to 12 months in jail?

6    A.    I did three months.

7    Q.    And then you were released on parole prior to that time?

8    A.    Yes.

9    Q.    I'm sorry, you were sentenced to 6 to 12 months and then

10   got paroled after three months?

11   A.    Yes.

12   Q.    And, sir, am I correct in also stating that you've had

13   some problems with prescription medication?

14   A.    Yes.

15   Q.    And that would be problems related to being addicted to

16   prescription medication, is that correct?

17   A.    That's correct.

18   Q.    Do you know a person by the name of John Cooley?

19   A.    Yes, I do.

20   Q.    Do you see him in the courtroom?

21   A.    Yes.

22   Q.    Can you identify him, please?

23   A.    He's right here, (indicating).

24         MR. TRABOLD:  Your Honor, let the record reflect the

25   witness has identified the defendant?

36

1           THE COURT:  It does.

2   BY MR. TRABOLD:

3   Q.    Mr. Crockett, how long have you known Mr. Cooley?

4   A.    At least 35, 37 years.

5   Q.    And would it be fair to say that to a large extent you've

6   grown up with him almost -- he's been in your life for a

7   lengthy period of time?

8   A.    All his life, really.

9   Q.    And you've interacted with him in social circles and you

10  have similar acquaintances, by virtue of Erie being a small

11  town, you probably know the same circle of people, roughly?

12  A.    That's correct.

13  Q.    Now, back in November of last year, 2002, did you have a

14  conversation with the defendant?

15  A.    Yes.

16  Q.    Can you explain to the jury what was the nature of that

17  conversation?

18  A.    John came to my house and --

19  Q.    Approximately, what time of day was it that he came to

20  your house?

21  A.    In the afternoon.

22  Q.    And what was his demeanor like when he came to your

23  house?

24  A.    He was angry.

25  Q.    And what is it about his appearance or his speech that

37

1   caused you to conclude he was angry?

2   A.    The way he was talking, he was talking louder than he

3   would normally be talking, he was real serious about what he

4   was saying.

5   Q.    And prior to him coming to see you this time, you're

6   talking about right now in November of last year, prior to

7   that, when was the last time you had seen him before that?

8   A.    About a week, two weeks.

9              THE COURT:  Keep your voice up, please.

10             THE WITNESS:  About a week, two weeks.

11  BY MR. TRABOLD:

12  Q.    And when you saw him a week or two previous, was he angry

13  or did you have any reason to conclude that he was angry?

14  A.    No.

15  Q.    Just a normal conversation about something not related to

16  this case?

17  A.    That's correct.

18  Q.    He comes to your house and he's angry.  Do you let him in

19  the house, do you talk to him outside?

20  A.    No, I let him in.

21  Q.    What does he tell you?

22  A.    He told me to deliver a message to my brother about his

23  wife.  I won't say the words, but he said --

24  Q.    Let me stop you there, your brother would be who?

25  A.    James Crockett.

38

1   Q.    And your brother's wife, what is her name?

2   A.    Joyce.

3   Q.    Joyce Belle?

4   A.    Yes.

5   Q.    Sir, I understand, but I would like you to say the words

6   that were said to you, okay?

7   A.    Okay.

8   Q.    Go ahead?

9   A.    He told me to tell my brother to tell that bitch of his

10  that if she didn't stay out of his business, that they was

11  going to wind up finding her in a trunk, or else don't make him

12  go to Detroit and have her come back here and barking like a

13  dog.

14  Q.    The portion about the trunk, what did you take that to

15  mean?

16  A.    Find her dead or something in a trunk.

17  Q.    And what did you take the part about barking, going to

18  Detroit and then barking like a dog part of his statement, what

19  did you take that to mean?

20  A.    He was going to Detroit and see the people about that

21  voodoo and put some kind of hex or something on her.

22  Q.    Did you know from your past knowledge and your past

23  interaction with this defendant that he, for lack of a better

24  term, had some involvement or at least an interest in what

25  you're describing as voodoo?

39

```
 1   A.    Yes.

 2   Q.    So when he made the comment about Detroit, you knew that

 3   to be about voodoo?

 4   A.    Right.

 5   Q.    How is it you knew that?

 6   A.    Because of conversations we had before.

 7   Q.    And what was in Detroit?

 8   A.    Whoever this woman is over there.

 9   Q.    There's a woman in Detroit --

10   A.    That practices voodoo.

11   Q.    And how do you know that?

12   A.    From John.

13   Q.    And John, you mean the defendant?

14   A.    Yes, sir.

15   Q.    Now, when he came to you and told you this information

16   about the trunk and about this Detroit thing, did you have any

17   idea what he was talking about?

18   A.    Not really.

19   Q.    Did you know at that point in time that your brother,

20   Jimmy or James, was incarcerated?

21   A.    Did I know he was incarcerated?

22   Q.    Yes.

23   A.    Yes.

24   Q.    And did you know at that point in time that your brother

25   was providing information to law enforcement about the
```

40

1  defendant?

2  A.    No, he wasn't.

3  Q.    You weren't even aware of that?

4  A.    No.

5  Q.    Did Mr. Cooley say anything to you about what he would do

6  with regard to Joyce Belle's residence or her living

7  arrangement?

8  A.    Put her out of the house because his name I think is on

9  the deed of my brother's house.

10  Q.    He told you that day, the same day, the same

11  conversation, that he was going to put Joyce out on the street?

12  A.    If she didn't stay out of his business.

13  Q.    Now, then -- that's pretty much the sum and substance of

14  the conversation?

15  A.    Basically, uh-huh.

16  Q.    Did he say anything else to you that you can recall?

17  A.    No, he was just serious about it, giving Jimmy that

18  message.

19  Q.    How long a period of time total was he at your residence?

20  A.    Maybe about 20 minutes, half an hour.

21  Q.    And after he left, what did you do?

22  A.    I got in touch with my sister-in-law.

23  Q.    Being Joyce Belle?

24  A.    Right.

25  Q.    And did you inform her of the nature of your conversation

1   with the defendant?

2   A.   Yes, I did.

3   Q.   Did you tell anybody else about it?

4   A.   No, it was just me and my wife there.

5   Q.   Did you ever have a direct conversation with your

6   brother, Jimmy, in jail about it, that you can recall?

7   A.   He called later on, after I told Joyce, he had called

8   Joyce and they put me on a three-way.  That's when I had the

9   opportunity to tell him what was said.

10  Q.   And when you said -- you just mean a three-way phone

11  conversation where the three different people were on the line?

12  A.   That's correct.

13  Q.   And you then informed your brother of what was said?

14  A.   Right.

15  Q.   Did your brother tell you to then go do anything?

16  A.   No.

17  Q.   Did you then at some point, subsequent to that

18  conversation, go talk to somebody at the FBI?

19  A.   No.

20  Q.   Did someone then come and talk to you from the FBI at

21  some point in time?

22  A.   Yes.

23  Q.   And did you share the information that you had about what

24  had transpired?

25  A.   Yes.

42

1          MR. TRABOLD:  One moment, your Honor.  Nothing

2   further, your Honor.

3          THE COURT:  Ms. Frick.

4          MS. FRICK:  Thank you, your Honor.

5                     CROSS-EXAMINATION

6   BY MS. FRICK:

7   Q.    Mr. Crockett, you're clear in your own mind that this

8   happened in late November of 2002, is that right?

9   A.    That's correct.

10  Q.    And the reason you're clear about that is that after this

11  happened, you had a telephone call with your brother and his

12  wife, and then you received a telephone call the next day from

13  the FBI, is that right?

14  A.    That's wrong.

15  Q.    Okay.  When did you hear from the FBI?

16  A.    The next afternoon, right after I left from John's house.

17  Q.    The next day or the same day?

18  A.    The next day.

19  Q.    Okay.  But in between that time you spoke with your

20  brother, is that right?

21  A.    I delivered the message, yes.

22  Q.    Okay.  You did deliver the message?

23  A.    That's correct.

24  Q.    Okay.  So you delivered the message to your brother?

25  A.    I delivered it to his wife first, later he called that

43

1   afternoon and she put us through on the three-way and that's

2   when I told him.

3   Q.    Okay.  So the message that you related, Mr. Cooley said

4   to you was, tell your brother to tell his wife to stay out of

5   my business?

6   A.    That's right.

7   Q.    Or she'll end up in the trunk, and then he said something

8   about Detroit and he'll have her barking like a dog, is that

9   right?

10  A.    No, he said that if she didn't stay out of his business,

11  they was going to wind up finding her in a trunk, or don't make

12  him go to Detroit and come back here and have her barking like

13  a dog.

14  Q.    Okay.  Now, the first thing you did after that discussion

15  was you went and told your sister-in-law, is that right?

16  A.    I called my sister-in-law.

17  Q.    Did she call the police?

18  A.    Not to my knowledge.

19  Q.    Did you call the police?

20  A.    No.

21  Q.    And it was soon after that that you had a phone call from

22  your brother, who was in jail, is that right?

23  A.    It was later in the day, yes.

24  Q.    And you knew your brother was in jail, is that correct?

25  A.    Of course.

44

1   Q.    And you knew he was in jail for serious drug charges, is
2   that right?
3   A.    That's correct.
4   Q.    And you relayed what had been said to him, is that
5   correct?
6   A.    Yes.
7   Q.    And did he direct you to call the police?
8   A.    No.
9   Q.    Did you then call the police yourself?
10  A.    No.
11  Q.    To your knowledge, did your sister-in-law, Joyce, call
12  the police?
13  A.    No.
14  Q.    The first thing you know, the next thing that happens is
15  you get a call from the FBI about this, is that correct?
16  A.    That's wrong.
17  Q.    What happened next?
18  A.    The next day after I got out of church, I went to John's
19  house to tell him that I delivered the message and I didn't
20  want anything else to do with this, don't involve me in it, I
21  don't have anything to do with none of this mess.
22  Q.    All right, even before you see the FBI, you see the
23  defendant again, is that right; to just tell him you want to
24  stay out of this and that you did deliver the message?
25  A.    No, when I got to his house, he wasn't at home and I told

45

1    his wife to tell him to call me when he did get home.  In the

2    meantime when I left his house and I got home, that's when I

3    was approached by the two officers and they asked me could they

4    talk with me, after they introduced themselves, and I said yes.

5    And they asked me what happened when John came over to my

6    house, so and so forth, and I explained that to them exactly

7    what I said to you.

8    Q.    Now, the message that you were to deliver had to do with

9    your brother telling his wife to stay out of his business, is

10   that correct?

11   A.    That's correct.

12   Q.    The message was not for you to tell your brother to stay

13   out of his business, is that right?

14   A.    No.

15   Q.    Okay.  And there was also a reference to the fact that

16   Joyce -- and presumably before he went to jail your brother,

17   were living in the house that was owned by Mr. Cooley, is that

18   right?

19   A.    That's incorrect.

20   Q.    You said that Mr. Cooley owned the house that Joyce was

21   living in?

22   A.    No, I did not.  I said that his name was on the deed with

23   my brother's.

24   Q.    Okay.  His name was on the deed?

25   A.    That's what I said.

46

1    Q.    But he didn't own the house?

2    A.    He would be partial owner if his name was on the deed.

3    Q.    All right.  Now, you told Mr. Trabold that at some point

4    in time you had problems with prescription medications, is that

5    right?

6    A.    That's correct.

7    Q.    What kind of prescription medication was that?

8    A.    Vicodin.

9    Q.    When was that that you had the problem?

10   A.    That was in 2000.  I had been involved in an accident.

11   Q.    And did you receive treatment for that?

12   A.    Yes, I did.

13   Q.    And when did you receive treatment for that?

14   A.    During that time, 1999 and 2000.

15   Q.    So for about a year you were addicted to --

16   A.    It was more than a year, I was seeing a doctor for

17   something like a year and a half.

18   Q.    And you were addicted to prescription pain medication?

19   A.    I became addicted to it, yes.

20   Q.    Did you then go to a drug rehabilitation?

21   A.    Yes, I did.

22   Q.    And when was that?

23   A.    2000.

24   Q.    And when did you start taking the prescription drug

25   medication?

47

1  A.    When?

2  Q.    Yes.

3  A.    '99.

4  Q.    Okay.  So you started taking it in '99, you were on it

5  until sometime in 2000, and then you went to a drug

6  rehabilitation, is that right?

7  A.    That's right.

8  Q.    And how long were you at the drug rehabilitation?

9  A.    Forty-five days.

10 Q.    Forty-five days?

11 A.    Yeah.

12        MS. FRICK:  No other questions.

13        THE COURT:  Anything else of this witness, Mr.

14 Trabold?

15        MR. TRABOLD:  No, your Honor.

16        THE COURT:  You're excused, sir.

17        MR. TRABOLD:  May we approach side bar, your Honor.

18        THE COURT:  Yes.

19        (At side bar on the record.)

20        MR. TRABOLD:  I plan on calling Mr. Figueroa, I can

21 call somebody else.

22        THE COURT:  There are other 302's you needed to

23 review as well?

24        MS. FRICK:  It depends on who else you call now.

25        MR. TRABOLD:  There's just the two of them.

48

1          THE COURT:  We'll take a short break and come back.

2          (End of discussion at side bar.)

3          THE COURT:  Members of the jury, prior to the next

4     witness going on, there is a document that defense counsel has

5     requested to review and I'm going to permit her to do that.  So

6     we're going to take a very short break, then we'll resume.

7          (Recess from 10:07 a.m.; until 10:20 a.m.)

8          THE COURT:  Call your next witness.

9          MR. TRABOLD:  Your Honor, the United States calls

10    Rich Figueroa.

11         THE CLERK:  Please raise your right hand.  Could you

12    state your name fully and spell it for the record?

13         THE WITNESS:  Richard Figueroa, F-i-g-u-e-r-o-a.

14         RICHARD FIGUEROA, GOVERNMENT WITNESS, SWORN

15                     DIRECT EXAMINATION

16    BY MR. TRABOLD:

17    Q.    How old are you, sir?

18    A.    I'm 33.

19    Q.    You far did you go in school?

20    A.    I graduated from high school.

21    Q.    Mr. Figueroa, are you an Erie native?

22    A.    No, sir.

23    Q.    When did you first find yourself in Erie?

24    A.    It was back in '93.

25    Q.    Why did you come to Erie?