E X H I B I T "G"

```
 1  Q.   Okay.  Now, was the defendant upset that Ray Simmons was
 2  undercutting the price?
 3  A.   He just didn't want me to know what was going on, but he
 4  kept saying that comes from someone else.  He kept on saying
 5  that comes from another connector, whatever, I keep telling
 6  him, well, it's coming from the same place or whatever.  John
 7  didn't want to admit that.
 8  Q.   Did you know at some point in time that Ray Simmons went
 9  to the Dominican Republic?
10  A.   Yes, I did.
11  Q.   Were you surprised when Ray Simmons came back from the
12  Dominican Republic?
13  A.   Yes, I was.
14  Q.   Why?
15  A.   Because Ray Simmons was supposed to --
16            THE COURT:  Keep your voice up.
17            THE WITNESS:  Ray Simmons wasn't supposed to come
18  back.
19  BY MR. TRABOLD:
20  Q.   Did you have a discussion with the defendant that caused
21  you to conclude Ray Simmons was not supposed to come back from
22  the Dominican?
23  A.   Yes, on the street Ray Simmons was supposed to have been
24  working for the police.  And by him supposedly working for the
25  police, John told Jose that he was hot.  And by Jose knowing
```

1 that he was hot, he told Raymond, that when Raymond had a
2 ticket to go to the Dominican Republic, Jose made a phone call
3 to say that he was hot, if he makes any phone calls back to the
4 United States, that they're supposed to take him to the woods
5 and kill him.
6 Q. Now, just so we're clear, when you say that Raymond was
7 hot, what do you mean by that?
8 A. Meaning he's working for the police, he got busted.
9 Q. And the information you received from the defendant was
10 that if while in the Dominican Ray Simmons got on his cell
11 phone and made any calls back to the states, Ray Simmons would
12 not being coming back to America?
13 A. That's right.
14 Q. Did there come a point in time in your relationship, drug
15 dealing relationship with the defendant, where you took note of
16 him trying to cause a problem between yourself and other
17 distributors of crack?
18 A. Yes, he kept me and Jimmy Crockett at a distance. He
19 would say that I said something about Jimmy, and Jimmy would
20 have an attitude towards me. He'd tell Jimmy that I said
21 something about him, to keep me and Jimmy apart from each
22 other. That way we was never communicating as far as how much
23 he was getting his drugs for, how much I was getting my drugs
24 for or, you know what I mean, who was working, who wasn't
25 working.

1  Q.  Was that the same type of situation or relationship
2  between you and Andre Henderson?
3  A.  Yes.
4  Q.  This separation, did you have a lot of interaction or
5  personal observations when the defendant would distribute crack
6  to other people; I mean, did he let you in on his dealings with
7  other people?
8  A.  No.
9  Q.  You were kept separate from that?
10 A.  That's right.
11 Q.  Did you know, at any point in time did you become aware
12 that during your dealings with Cooley, that the police were
13 conducting surveillance on you?
14 A.  Yes.
15 Q.  Explain that to the jury, please?
16 A.  I went to my house one time, which is 750 East 19th
17 Street. And for some reason I didn't go right in the house. I
18 set back in the car and laid back on my seat, just like this,
19 (indicating). I was just looking down the street, just
20 thinking about something. And all of a sudden a green Mustang
21 came around the corner. And I looked, and I caught the eyes of
22 this man right here, this officer right here, (indicating).
23 Q.  Just so the record is clear, can you point to him, so
24 just we have it on the record?
25 A.  This blond haired officer right here.

```
 1  Q.   Okay.  Now, was the defendant upset that Ray Simmons was
 2  undercutting the price?
 3  A.   He just didn't want me to know what was going on, but he
 4  kept saying that comes from someone else.  He kept on saying
 5  that comes from another connector, whatever, I keep telling
 6  him, well, it's coming from the same place or whatever.  John
 7  didn't want to admit that.
 8  Q.   Did you know at some point in time that Ray Simmons went
 9  to the Dominican Republic?
10  A.   Yes, I did.
11  Q.   Were you surprised when Ray Simmons came back from the
12  Dominican Republic?
13  A.   Yes, I was.
14  Q.   Why?
15  A.   Because Ray Simmons was supposed to --
16            THE COURT:  Keep your voice up.
17            THE WITNESS:  Ray Simmons wasn't supposed to come
18  back.
19  BY MR. TRABOLD:
20  Q.   Did you have a discussion with the defendant that caused
21  you to conclude Ray Simmons was not supposed to come back from
22  the Dominican?
23  A.   Yes, on the street Ray Simmons was supposed to have been
24  working for the police.  And by him supposedly working for the
25  police, John told Jose that he was hot.  And by Jose knowing
```

1  that he was hot, he told Raymond, that when Raymond had a
2  ticket to go to the Dominican Republic, Jose made a phone call
3  to say that he was hot, if he makes any phone calls back to the
4  United States, that they're supposed to take him to the woods
5  and kill him.
6  Q.    Now, just so we're clear, when you say that Raymond was
7  hot, what do you mean by that?
8  A.    Meaning he's working for the police, he got busted.
9  Q.    And the information you received from the defendant was
10 that if while in the Dominican Ray Simmons got on his cell
11 phone and made any calls back to the states, Ray Simmons would
12 not being coming back to America?
13 A.    That's right.
14 Q.    Did there come a point in time in your relationship, drug
15 dealing relationship with the defendant, where you took note of
16 him trying to cause a problem between yourself and other
17 distributors of crack?
18 A.    Yes, he kept me and Jimmy Crockett at a distance. He
19 would say that I said something about Jimmy, and Jimmy would
20 have an attitude towards me. He'd tell Jimmy that I said
21 something about him, to keep me and Jimmy apart from each
22 other. That way we was never communicating as far as how much
23 he was getting his drugs for, how much I was getting my drugs
24 for or, you know what I mean, who was working, who wasn't
25 working.

36

1  Q. Was that the same type of situation or relationship
2  between you and Andre Henderson?
3  A. Yes.
4  Q. This separation, did you have a lot of interaction or
5  personal observations when the defendant would distribute crack
6  to other people; I mean, did he let you in on his dealings with
7  other people?
8  A. No.
9  Q. You were kept separate from that?
10 A. That's right.
11 Q. Did you know, at any point in time did you become aware
12 that during your dealings with Cooley, that the police were
13 conducting surveillance on you?
14 A. Yes.
15 Q. Explain that to the jury, please?
16 A. I went to my house one time, which is 750 East 19th
17 Street. And for some reason I didn't go right in the house. I
18 set back in the car and laid back on my seat, just like this,
19 (indicating). I was just looking down the street, just
20 thinking about something. And all of a sudden a green Mustang
21 came around the corner. And I looked, and I caught the eyes of
22 this man right here, this officer right here, (indicating).
23 Q. Just so the record is clear, can you point to him, so
24 just we have it on the record?
25 A. This blond haired officer right here.

```
1           MR. TRABOLD:  Your Honor, let the record reflect the
2   witness is pointing to Trooper Weindorf.
3           THE COURT:  It does.
4   BY MR. TRABOLD:
5   Q.   What happened between you and Trooper Weindorf?
6   A.   I catch his eye, as soon as I catch his eye contact, I'm
7   like this is the police, this is the feds --
8   Q.   Let me stop you there, we'll go on, but I want you to
9   explain to the jury what it is about seeing Trooper Weindorf
10  that immediately caused you to conclude that it was the police
11  or the feds?
12  A.   White people don't come down in our neighborhood.
13  Q.   Now, just let's take that one step further, though.  Why
14  is it that you typically do not see people looking like Trooper
15  Weindorf in your neighborhood?
16  A.   Because this is a very bad area and you just don't branch
17  off of our street and come down into our neighborhood because
18  you're liable to get a brick in your window or something
19  because we know the average white person do not come down our
20  neighborhood unless it's the police or you're buying drugs.
21  Q.   So you see Trooper Weindorf while you're in your car,
22  he's driving what?
23  A.   He's driving a green Mustang.
24  Q.   What then happens?
25  A.   Now, I keep my eye on Mr. Weindorf, and he goes down by
```

1  Austin.  But this is strange because I'm just constantly
2  keeping my eye on him and he dips into Austin.  But then he
3  pulls on the same side of the street that I'm parked on.  I'm
4  just staring at him, he's looking in the rearview mirror, I'm
5  just glancing at him, I'm glancing at him, but this guy never
6  gets out of the car.  I never get out of my car, so I'm just
7  staring at him.  So immediately I grabs my cell phone, pick my
8  cell phone up, bang, bang, bang.  I hit John on the two-way,
9  his phone is not on.  I hit him again on the two-way, his phone
10 is still not on.  I pick my phone up, now I'm using my dial
11 phone, I dial his house number.  I call him J.  I'm like yo,
12 J., he's like yo, what's up.  Pick your phone up, man.  He
13 picks his phone up, he put his house phone down, we got back on
14 the walkie-talkie, I say step outside.  He steps outside, I
15 said look down the street to me.  He looks down the street.
16 I'm like you see that green Mustang right there, he's like
17 yeah, I see it.  I'm like that's the feds, they're watching us.
18 He's like are you sure -- yeah, it's the feds.  I was like
19 watch this.  I drove down the street right where he was at, he
20 pulls off down the street.  And he takes a quick right going
21 down Ash Street to 18th Street.  And he cut across going
22 towards Parade.  I go passed John's house, straight down 19th
23 Street, he's coming from 18th Street, 18th and Parade, and he's
24 coming back up to 19th and Parade.  But I'm right at the corner
25 on him, now I'm watching him.  So I gets behind him and start

following him. And when I follow him, I follow him all the way up to 23rd Street, he went up to like 26th Street. I goes around to my house. Came right around 23rd, right down 23rd and German to 22nd and German, I turn the corner, I jumps out of my car. My brother is sitting in the driveway. I say yo, P., the feds is watching, the feds is on us. And he's like for real. Man, I was just following this dude, this dude was just at the house with me. Then John came and picked me up from his house. And he's let's like hurry up. I told my brother to make sure you clean everything out. I jumped in John's Expedition and we go back down 18th Street. Went back down to 18th and sat on the tracks. And we picked him up again. And we went around the corner, he made the light and we lost him, we didn't see him anymore.

Q. So you were aware that surveillance was being conducted on you?

A. Oh, yeah.

Q. Did there ever come a point in time when you recalled the defendant having any discussions with you about a person by the name of Jerome Odom?

A. Yes.

Q. What was the nature of those discussions?

A. I wanted a kilo of crack cocaine because the weekend was here, everyone was asking for some work. I asked John what's up, you know what I mean. He say he got to go over to Jerome

1   dom's house. I was like what the heck are you going over to
2   Jerome house for.
3   Q.   Why did you say that, what caused you to say what the
4   heck are you going to Jerome house for?
5   A.   I mean, he's a police officer. He's an Erie police
6   officer at the time, I'm like why are you going over to
7   Jerome's house for. And he's like because it's over Jerome's
8   house. You stored the dope at Jerome's house. And he said,
9   well would you expect the dope to be at a police house. I'm
10  like, hey, all right then.
11  Q.   Is that the extent of the conversation you had with the
12  defendant about Jerome?
13  A.   I had to wait, I had to wait -- to Jerome got back before
14  he got any kilos, I waited a couple days before he got back.
15  Q.   Do you know a person by the name of Curas Newsome?
16  A.   Yes, I do.
17  Q.   Did you ever travel to Meadville with Curas Newsome?
18  A.   With her no, but I traveled down there with John, yes.
19  Q.   With John, you mean the defendant?
20  A.   Right.
21  Q.   And approximately what time period is it when you
22  traveled with the defendant to Meadville?
23  A.   About '93.
24  Q.   And who did you go see in Meadville?
25  A.   Curas.

1  Q.     And what did you do when you were there in Meadville?
2  A.     I sit in the house. Just sitting around in the house.
3  John was taking crack cocaine down there to her. They were
4  cooking it in the kitchen and cutting it up. People was
5  knocking on the door and they were serving them, and I was just
6  sitting around waiting. Then they got finished making these
7  sales, John went in the room with her for a couple hours, while
8  I sat on the couch. Then he called back and asked, he didn't
9  call back, he'd yell out the door and ask me that did I want to
10 go around the corner and shoot dice. I was like yeah, so we'd
11 end up going around to Curas friend's house and ended up
12 shooting dice for the rest of the night.
13 Q.     While you were at Curas Newsome's house, people were
14 coming into her house and she was doling out crack?
15 A.     That's right.
16 Q.     Now, recently, fairly recently while you've been
17 incarcerated awaiting sentencing, did you send some letters to
18 the defendant?
19 A.     Yeah.
20 Q.     What was the nature of those letters?
21 A.     The nature of my letters, I sent it to him because I
22 asked him -- I sent it to my mom, and I had my mom and my
23 brother hand deliver these letters to him. And the nature of
24 these letters was, I mean, you reneged on our deal just and you
25 beat me out of all this money of the kilos we had a deal for,

1  so I was like just give me my portion of my money and I will
2  keep your name out of it. I wouldn't even say nothing about
3  you, whatever, you go do your own, whatever, I'll just handle
4  my time. But it got back to me that John's laughing at me,
5  calling me a snitch and putting threats on my brother, telling
6  my brother certain things. So I wrote him another letter. The
7  next letter was vicious. I mean, I really got nasty in the
8  letter, I called him all types of mother F's, B's, punks, I
9  mean I really got nasty on him. I told him if you don't have
10 my $100,000 to my mom, that I was going to tell everything to
11 the feds.
12 Q.   Go ahead.
13 A.   And on the letters, whatever, I had told him that he was
14 a snake because he told all the girls that I was messing with
15 things that I told him about, I did with these girls, he told
16 the girls, and the girls got mad at me and told me whatever. I
17 wrote on the letter it will be very disrespectful and wrong if
18 I tell his wife all the things that he was doing with all the
19 womans I was dropping him off to every night.
20 Q.   Okay. Was there an arrangement between you and the
21 defendant that caused you to be upset in order to send these
22 letters?
23 A.   Yes.
24 Q.   What was the nature of your agreement with the defendant?
25 A.   The nature of that was he was supposed to have provided a

```
 1  lawyer for me when -- if I ever got caught up, he was supposed
 2  to provide that lawyer for me.  He was supposed to keep money
 3  in my books, take care of my children, send money for my
 4  children because there was some money we had agreed on.
 5  Q.    You had had discussions with the defendant about that
 6  prior to the time you got arrested?
 7  A.    That's right.
 8  Q.    Let's explain one thing.  What do you mean when you say
 9  put money on your books, what are you talking about?
10  A.    My commissary, so I can get things in the jail for me to
11  eat, whatever, he was supposed to provide that, not my mom.
12  Q.    So when you're incarcerated, everybody has a commissary
13  fund that you can draw on to buy certain things?
14  A.    That's right.
15  Q.    And the defendant told you he was going to provide you a
16  lawyer?
17  A.    That's right.
18  Q.    You get incarcerated, do you attempt to make contact with
19  the defendant?
20  A.    Yes, I made contact with him one time, he asked me is
21  everything all right.  I told him yeah, they was asking
22  questions about him.  But I was don't even worry about it, you
23  know what I mean, I'm all right, I'm cool right now.  I go to
24  call him back, he done change the number?
25  Q.    And you never had --
```

1     A.     I never had a conversation with him again.

2     Q.     Are you aware, have you had discussions with the
3 defendant about him putting his assets in other people's names?

4     A.     Yes.

5     Q.     Did he tell you that he did put assets in other people's
6 names?

7     A.     Yes.

8     Q.     Did he explain to you why it was that he did that?

9     A.     Drug dealers put assets in other people's names because
10 for the simple fact if they ever got arrested, you could never
11 take their property from them or you could never get nothing
12 from them. That's the way you hide things when you're dealing
13 drugs, you put nothing in your name. That's what he was doing.

14     Q.     Do you recall having a conversation with the defendant
15 about somebody by the name of Carl Knight?

16     A.     Yes.

17     Q.     Did the defendant tell you what he thought of Carl
18 Knight?

19     A.     Yes.

20     Q.     What did he say about Carl Knight?

21     A.     He told me that Carl Knight was very stupid. He said
22 because if it was him and everybody testified against him, like
23 they did on Carl Knight, it's like he would have every one of
24 them killed. And he'd sit in jail and after the job was
25 finished, then he would be bailed out.

1  Q.   Because there would be no more witnesses to testify?
2  A.   That's right.
3       MR. TRABOLD: Just one moment, your Honor.
4  BY MR. TRABOLD:
5  Q.   You have already told the jury and went through that you
6  received nine ounces from the defendant in kilo quantities from
7  the defendant through Jose. How many kilos did you receive
8  from the defendant in 2000?
9  A.   Nine.
10 Q.   Why is it that you stopped getting crack in whatever size
11 from the defendant?
12 A.   We stopped because it was election time and that's a bad
13 time to be pushing drugs is during election time.
14 Q.   Explain what you mean by that to the jury?
15 A.   Everybody is looking for political spots and promotions
16 and just everybody is trying to get an office, everybody is
17 trying to make a point by arresting drug dealers. So that's a
18 bad time to be pushing drugs is during election time. So we
19 stopped around that time, we stop around that time.
20 Q.   And was the stopping, the election time reason for
21 stopping, did you have a conversation with the defendant about
22 that?
23 A.   Yes.
24 Q.   Now, do you consider yourself the defendant's partner?
25 A.   Yes, I am. I consider myself his partner. And, like I