IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | 1:02cr40 |
| | ) | **Electronic Filing** |
| **JOHN COOLEY** | ) | |


### OPINION


On February 25, 2004, John Cooley ("defendant") was sentenced to life imprisonment after a jury found him guilty of conspiring to distribute 50 grams or more of crack cocaine. Presently before the court is defendant's motion pursuant to Section 404 of the First Step Act. For the reasons set forth below, defendant's motion will be granted in the form of a re-imposed sentence of time served to date plus a reasonable period of time (not to exceed 21 days) for the Bureau of Prisons to issue any required notifications and process the release of defendant and 4 years of supervised release.

Defendant seeks a sentence of 207 months as of the date his Section 404 motion was filed. Such a reduction would in effect be a sentence of time served as of that date, and in effect would be a sentence of approximately 254 months as of this date.[1] Based on the amount of crack cocaine attributed to defendant in the original Presentence Investigation Report ("PSIR"), he highlights the changes in the guidelines sentencing range and general sentencing practices that have occurred since his original sentencing. He further notes that he only had one prior criminal

---

[1] Defendant's life sentence placed him outside the Bureau of Prison's normal calculations of credit for good time served. The parties have not identified any institutional conduct that might preclude defendant from receiving good time credit and the record before the court indicates defendant does not have any infractions. Receipt of good time credits after 20 years of incarceration (21 years minus the first 12 months) would add approximately 36 months to defendant's total, resulting in credit for serving approximately 290 months.

conviction.  And finally, he maintains that his current age and his post-sentencing rehabilitative efforts support the requested relief.

The government contends that defendant is not entitled to relief because the testimony at trial and sentencing unequivocally demonstrated that even if the Fair Sentencing Act of 2010 had been applied, defendant would have been charged with a statutory violation that would permit the life sentence he received.  Further, from its perspective, the drug quantities attributable to defendant through the trial and sentencing testimony would result in the same guidelines sentencing calculations.  Thus, the same sentence would and should be imposed as was initially imposed under the then-mandatory sentencing guidelines and then re-imposed after remand for resentencing following the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005).

The government further asserts that even assuming this court can exercise its discretion and resentence defendant under Section 404(b), defendant's offense conduct and criminal history counsel against such relief.  It highlights the offense conduct of record revealing that defendant was a major kingpin overseeing a massive drug conspiracy that distributed a potent form of crack cocaine in the Erie area for over 10 years.   The conduct included the bartering of firearms and the physical use of them in furtherance the conspiracy.  Defendant also received information about breaking law enforcement activities from his cousin, who was an Erie Police officer, and repeatedly used that information to thwart detection of his and his co-conspirators' drug distribution activities.  And when he later came under investigation, he engaged in the attempted intimidation and actual physical threatening of individuals who were or had a connection to prior co-conspirators whom he believed had become cooperating witnesses.

The standards by which we review First Step Act motions are set forth in United States v. Jaison Ceatrix Thompson, 1:05cr42, 2019 WL 4040403 (W.D. Pa. Aug. 27, 2019), United States

v. Warren, 1:08cr46, Doc. No. 109 (W.D. Pa. Nov. 6, 2019), United States v. Knight, 1:98cr03, 2021 WL 266341 (January 27, 2021), and United States v. Thomas, 3:01cr05, 2023 WL 110173 (January 5, 2023) and those standards are incorporated herein.  Those standards and the record as developed in conjunction with the instant motion sufficiently support the determination that the court should exercise its discretion and award defendant the reduced sentence referenced above.

We previously have rejected the government's contention that a defendant should be denied relief merely because he or she would be subject to the same statutory penalties and guidelines sentencing range if the case were brought today.  See United States v. Frederick, 2:07cr387 (W.D. Pa. Feb. 4, 2020), Doc. No. 452 at p. 5; United States v. Dennis, 2:07cr37 (W.D. Pa. Feb. 18, 2020), Doc. 63 at 2-3.  We did so because a defendant's eligibility for relief is determined solely by qualifying under the First Step Act's definition of a "covered offense" and is not conditioned on a corresponding decrease in the applicable guidelines sentencing range. See Thompson, 2019 WL 4040403 *11 n.6 (citing United States v. Garrett, 2019 WL 2603531, *3 (S.D. Ind. June 25, 2019) (rejecting the government's contention that relief should be denied where application of the career offender guidelines continued to produce the same sentencing range of 360 months to life and opining that "[t]he fact that Mr. Garrett's guideline range remains unchanged does not foreclose a reduction of his sentence, at least not where he was sentenced to the mandatory minimum and the mandatory minimum sentence was thereafter reduced by section 2 of the Fair Sentencing Act.") (citing United States v. Bean, No. 1:09-cr-143, 2019 WL 2537435, at *5–6 (W.D. Mich. June 20, 2019)); accord United States v. Biggs, 2019 WL 2120226, *3-4, 7 (N.D. Ill. May 15, 2019) (same); United States v. Hadley, 389 F. Supp.3d 1043, 1048 (M.D. Fla. 2019) (granting First Step Act motion notwithstanding unchanged career offender guidelines sentencing range of 360 months to life); United State v. Payton, 2019 WL 2775530, *4-5 (E.D. Mich. July 2, 2019) (granting First Step Act relief where

career offender guidelines sentencing range remained unchanged); <u>United States v. Clemon</u>, 2019 WL 6894130, *1 (D. S.C. Dec. 18, 2019) (granting relief where pre- and post-First Step Act guidelines sentencing range remained unchanged); <u>cf.</u> <u>United States v. Brandon</u>, 2019 WL 4139400, *3-4 (E.D. Mich. Aug. 30, 2019) (granting First Step Act relief notwithstanding presidential commutation of sentence that reduced it below the guidelines sentencing range applicable at First Step Act re-sentencing) (collecting cases).  Thus, even assuming we are unable to re-examine a defendant's prior guidelines sentencing calculations and he or she remains subject to the same guidelines sentencing range, these sentencing factors are not legal barriers to awarding First Step Act relief.

We likewise have rejected the government's argument that we should follow the sentencing rationale utilized at a defendant's original sentencing hearing and simply arrive at the same sentence.  <u>See</u> <u>United States v. Frederick</u>, 2:07cr387,  Doc. No. 452 at p. 5 (W.D. Pa. Feb. 4, 2020); <u>United States v. Warren</u>, 1:08cr46, Doc. No. 109 (W.D. Pa. Nov. 6, 2019); <u>United States v. Dennis</u>, 2:07cr37, Doc. 63 at 3 (W.D. Pa. February 18, 2020); <u>United States v. Moreland</u>, 2:07cr387, Doc. No. 473 at p. 6, 10 (W.D. Pa. March 2, 2022); <u>United States v. Thomas</u>, 3:01cr05, Doc. No. 259 at p. 5.  That rationale was advanced under a set of existing precepts that were displaced by the First Step Act and replaced by the standards embodied therein.  The standards now governing the task at hand were intended to give the defendant a "do-over of sorts" and we fail to see any sound justification for shirking the responsibility of performing that task under the guise of prior judicial musings rendered under meaningfully different circumstances.

We likewise have declined to limit our review of the information to be considered in conjunction with a section 404 First Step Act motion to 1) the information available at the time of the original sentencing and/or 2) only changes in the applicable guidelines.  <u>See</u> <u>Thompson</u>,

2019 WL 4040403, *8-11 (declining to adopt the scope of review under 18 U.S.C. § 3582(c)(2) on the ground that "the First Step Act contains its own independent grant of discretionary authority to the district courts by permitting a 'court that imposed a sentence for a covered offense' to 'impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act . . . were in effect at the time the covered offense was committed.'  This grant 'authorizes a reduction in sentence by its own terms' and does not depend on any complimentary authority in § 3582.") (quoting Dodd, 372 F. Supp.3d at 797 n.2 and Boulding, 379 F. Supp.3d at 653); Warren, 1:08cr46, Doc. No. 109 (W.D. Pa. Nov. 6, 2019) (declining to limit the scope of review to the record as it existed at the original sentencing hearing and/or to follow in lockstep with the original sentencing rationale).  Instead, we have determined that "a court deciding whether to impose a reduced sentence under section 404 should evaluate all such information pursuant to the 'lodestone' of sentencing factors set forth in 18 U.S.C. § 3553(a), any changes to the applicable guideline range, post-sentencing conduct bearing on rehabilitation and so forth." Thompson, 2019 WL 4040403, *10 (collecting cases).

This approach "permits the court to engage in its traditional role of factfinding in relation to the imposition of a sentence within the prescribed limits."  Id.  "It also permits the consideration of the brute facts and information that traditionally have a bearing on the sound exercise of the court's sentencing discretion."  Id.

Each of the above tenants has since become settled law under the United States Court of Appeals for the Third Circuit's controlling and persuasive precedent.  A defendant's eligibility to receive relief under the First Step Act turns on whether the elements of the offense of conviction were modified by sections 2 or 3 of the Fair Sentencing Act of 2010 and not whether his or her actual conduct might have supported charges of the same or greater magnitude.  United States v. Jackson, 964 F.3d 197, 201-02 (3d Cir. 2020).  This approach is supported by the textual

structure of the First Step Act, the "anti-surplusage" cannon of statutory construction, the verb tense utilized in the statute, the structure of the modifications made by the Fair Sentencing Act of 2010, the common understanding of a "violation" and "the clear weight of persuasive authority" issued by the other courts of appeals.  Id. at 202-04.  It likewise avoids the speculation that would ensue if eligibility determinations were based on the anticipated discretionary decisions that the prosecutors and courts frequently make under the myriad of circumstances that arise in such settings.  Id. at 205.  And it is in line with the straightforward approach that Congress chose in crafting the statute.  Id. ("Beyond a few specific limitations found within the First Step Act, we see 'no indication that Congress intended a complicated and eligibility-limiting determination at the 'covered offense' stage of the analysis.'") (quoting Wirsing, 943 F.3d at 186 (citing § 404(a), 132 Stat. at 5222)).

It likewise is settled that relief under the First Step Act is not barred solely because a defendant's actual conduct continues to produce the same guidelines sentencing range.  United States v. Easter, 975 F.3d 318, 327 (3d Cir. 2020).  Instead, once a defendant is determined to be eligible for relief, the court's decision as to whether to grant it and impose a new sentence must be grounded in a meaningful and individualized assessment of the § 3553(a) factors "to the extent they are applicable."  Id. at 326.  These factors encompass any post-sentencing developments, such as health issues and measures aimed at rehabilitation.  Id. at 326-27.  Thus, while an eligible defendant is not entitled to relief or even a plenary hearing in exercising the discretion afforded under the First Step Act, the "do-over of sorts" in deciding whether relief should be granted requires an application of the traditional sentencing factors to the current circumstances presented through the motion.  Id. at 325.  Such an approach 1) assures that any recent changes having a bearing on the mandated balancing of factors are to be considered and 2) advances the goals of promoting consistency and predictability in sentencing.  Id.

The Supreme Court and our Court of Appeals recently have clarified that the resentencing proceeding authorized by the First Step Act is anchored in the first instance in a recalculation of the movant's statutory penalties and the movant's "benchmark Guidelines range" as impacted only by the changes brought about by the Fair Sentencing Act of 2010. United States v. Shields, 48 F.4th 183, 191 (3d Cir. 2022) ("In the category of what courts 'may not' do, the Court held, contrary to Easter and [United States v. Murphy, 998 F.3d 549 (3d Cir. 2021)], that a district court's discretion does not empower it to 'recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing Act,' as 'the First Step Act directs district courts to calculate the Guidelines range as if the Fair Sentencing Act's amendments had been in place at the time of the offense.'") (quoting Concepcion v. United States, -- U.S. --, 142 S. Ct. 2389, 2402 (2022)). And then in further informing the decision as to whether to exercise the sentencing discretion afforded under the Act, "a district court adjudicating a motion under the First Step Act may consider [any] intervening changes of law (such as changes to the Sentencing Guidelines) or changes of fact (such as behavior in prison) in adjudicating a First Step Act motion." Shields, 48 F.4th at 190-91 (quoting Concepcion, 142 S. Ct. 2396). Changes of fact include both detrimental and favorable post-sentencing evidence bearing on the defendant's character. Id. at 191. Consideration of all such matters is grounded in the deeply rooted "federal sentencing framework" and permits the sentencing court "to consider the 'fullest information possible concerning the defendant's life and characteristics.'" Id. (quoting Concepcion, 142 S. Ct. at 2399 (quoting Pepper v. United States, 562 U.S. 476, 488, 490 (2011)).

Of course, our unwillingness to follow the government's lead on the tenants recounted above does not mean that the salient aspects of defendant's character and criminal history it has highlighted should be discounted. To the contrary, those factors continue to inform the sound

exercise of discretion in formulating an appropriate sentence.  But it is the discretion that has been afforded by the First Step Act that must be exercised in accordance with the prevailing standards of today notwithstanding the government's perception that yesterday's views were better.

 We turn to that undertaking in this case.  The Presentence Investigation Report determined that defendant's base offense level was determined by U.S.S.G. § 2D1.2 and an initial base offense level of 38 was warranted pursuant to § 2D1.1(c)(1) because defendant was accountable for the distribution of "over 1.5 kilograms of cocaine base;" a 4 level increase was warranted pursuant to § 3B1.1(a) because defendant was an organizer and leader of a distribution network that involved 5 or more participants; a 2 level increase was warranted pursuant to § 2D1.1(b)(1) because defendant possessed a gun in furtherance of the conspiracy and bought and sold firearms in conjunction therewith; and a 2 level increase was warranted pursuant to § 3C1.1 because defendant attempted to obstruct justice by advancing threatening communications against several of the co-conspirators in an effort to dissuade them from cooperating in the investigation and/or appearing as potential government witnesses.  The defendant objected to each of these sentencing factors.  He likewise objected to his prior criminal history calculations, arguing that his 1978 conviction for burglary was in effect stale and a criminal history category of II overrepresented the seriousness of his past criminal conduct.

 At sentencing, Judge McLaughlin overruled each of defendant's objections.  As to drug/ accomplice attribution, he credited the testimony of the drug distributors and co-conspirators who testified at trial and/or provided/proffered estimates of crack cocaine distributed by defendant, much of which was based on their personal involvement with him.  The testimony reflected an expanding distribution network over a ten-year period that at its maturity culminated in the distribution of multi-kilograms of crack cocaine to multiple distributors.  See, e.g.,

8

Government's Response in Opposition (Doc. No. 220) at 5-6 (highlighting the testimony of James Crockett indicating defendant supplied him with at least 5 kilograms from November 2000 through January of 2001; the testimony of James Johnson indicating he purchased at least 9 kilograms from defendant for redistribution in 2000; the testimony of Joseph Wayne indicating defendant supplied him with over 3 kilograms from the summer of 2000 through early 2001; the testimony of Larry Henry indicating defendant supplied him with approximately 8 kilograms from January through July of 2001; and the testimony of Shannon Mathis indicating defendant supplied him with 3 to 7 ounces of crack every week in the early years of the conspiracy, e.g., 1991 to 1993); see also Transcript of Sentencing Hearing of February 25, 2004 at p. 50-52 (highlighting testimony of Richard Figueroa, James Crockett, James Johnson, Curas Newsome, Andre Henderson, Eric Tate, Raymond Simmons, Jose Velasquez, Joseph Wayne, Larry Henry, Jamaal Smith, and Shannon Mathis in estimating attributable drug quantity).  Judge McLaughlin made the following assessment:

> Here, in my view, the testimony as to the drug quantities possessed does have a significant indicia of reliability.  In my view, the testimony fairly reflects a defendant who sat as an organizer of a massive and prolonged drug distribution scheme.  I also note that the testimony of Cooley's drug coconspirators was consistent and mutually reinforcing.  See United States v. Ventura, 353 F.3d 84 (1st Cir. 2003) at page 88.
> Having carefully considered the testimony relative to the amount of drugs moving in this conspiracy, I find that at a minimum drug quantity in the amount of 35 kilograms to 40 kilograms has been established.

Transcript of Sentencing Hearing of February 25, 2004 at p. 52.

Judge McLaughlin sustained the increase for defendant being a leader or organizer.  Defendant recruited several coconspirators to the operation, including Crockett, Wayne, Johnson and Mathis.  He claimed a greater share of the financial gains of the operation.  He instructed others on how to carry out tasks, including directing Johnson regarding debt collection.  He purchased cellular telephones for the operation and directed Newsome in cooking cocaine to

produce the final product.  Based on these aspects of the operation, Judge McLaughlin upheld the 4 level increase for being a leader and/or organizer.  Id. at 54.

Judge McLaughlin also upheld the 2 level increase for obstruction of justice based on three separate incidents.  First, defendant drove Wayne past the house where his children lived and told him: "if you cross me, I know where your kids stay."  Second, he told Potha Boyd that when he went to prison, he was "going to throw Larry Henry off the top tier of the cellblock as a result of [him] speaking with agents of the Federal Bureau of Investigation."  And finally, defendant approached the brother of James Crockett and told him to pass along a message: "[t]ell Jimmy to tell that bitch she better quit fucking with me or she's gonna end up in the trunk of a car."  Based on these events, the obstruction of justice increase was deemed to be applicable.[2]

A 2 level increase was applicable because defendant possessed a weapon in connection with the offense.  Johnson testified that defendant frequently carried a 9 millimeter hand gun throughout the conspiracy.  Defendant threatened Ken Henderson "by placing a loaded firearm in his mouth."  And Albert Boyd had sold 3 semiautomatic handguns to defendant in 1997.  Based on this evidence, defendant's objection was overruled.

Given the above rulings, defendant was held accountable for the distribution of over 1.5 kilograms of crack, producing an initial base offense level of 38.  This was the highest amount identified for the distribution of crack cocaine in U.S.S.G. § 2D1.1 at the time (i.e., the top of the scale).  He also received a 2 level increase for possessing a weapon in connection with the offense, a 4 level increase for being an organizer or leader, and a 2 level increase for obstruction

---

[2]  The government introduced evidence at trial that defendant utilized the threat of violence and intimidation in running the conspiracy, particularly with regard to the initiation of newcomers, who were often young or vulnerable due to life circumstances.  See id. at 60.  The record also reflected that defendant received confidential law enforcement information from sources within the law enforcement community, including defendant's cousin, and he pasted this information on to co-conspirators in furtherance of the conspiracy.

of justice.  These specific offense characteristics and Chapter 3 adjustments produced a total base offense level of 46.  Because the highest base offense level listed in the guidelines was 43, defendant's base offense level was adjusted to 43 pursuant to Application Note 2 of Part A of Chapter 5.

Judge McLaughlin also overruled defendant's objection to his criminal history calculations.  He highlighted the controlling authority and determined that defendant's prior conviction was a felony.  Consequently, he ruled that category II did not significantly overrepresent the seriousness of defendant's prior criminal record.  Id. at 57.

A total offense level of 43 and a criminal history category of II produced a guidelines sentencing range of life.  Judge McLaughlin sentenced defendant to life and a $100.00 special assessment.  Id. at 62.

The government posits that these findings cannot be revisited under the current motion and notes that with these increases, from its perspective granting defendant's motion in the face of these sentencing findings would in effect "disregard the seriousness of his offense." Government's Brief in Opposition at p. 15.  Thus, from the government's perspective, this court lacks the statutory authority to grant relief because "[t]he statutory and Guidelines ranges for [defendant's] actual conduct would have been identical after the Fair Sentencing Act" and given defendant's actual conduct the court should not revisit the sentence imposed by Judge Mclaughlin in any event.

Defendant appealed.  He challenged his conviction based on two evidentiary rulings made at trial.  He challenged his sentence based on United States v. Booker, 453 U.S. 220 (2005), which had been decided while his appeal was pending.

The United States Court of Appeals for the Third Circuit affirmed defendant's conviction. It determined that one of the evidentiary rulings was correctly decided and the other was at best

11

harmless error.  United States v. Cooley, 131 F. App'x 881, 882-83 (3d Cir. 2005).  As to

sentencing, the court observed that the trial court had "found that Cooley trafficked in over 1.5

kilograms of crack cocaine, that he was the leader or organizer of a criminal activity that

involved more than 5 criminal participants, that he possessed firearms during the conspiracy and

that he attempted to obstruct the administration of justice."  It nevertheless vacated his sentence

and remanded for resentencing in accordance with the advisory nature of the United States

Sentencing Guidelines after Booker.  Id. at 883 ("Cooley did not raise a Sixth Amendment

challenge to his sentence in the district court and Booker was decided after he was sentenced.

Nonetheless, pursuant to our recent decision in United States v. Davis, 407 F.3d 162 (3d Cir.

2005), we will remand for resentencing pursuant to Booker.").

        Judge McLaughlin reimposed a life sentence on remand.  After review, he re-affirmed all

of his rulings on the sentencing factors in dispute.  Transcript of Sentencing Hearing of October

18, 2005 (Doc. No. 220-2) at p. 15 ("I have carefully reviewed my findings made at the original

sentencing hearing, which established a total offense level of 46.  With a criminal history

category of II.  I believe then and I believe now, that those findings were fully supported by the

record and that the calculations were correct.").  He reiterated that the statutory penalties "as to

custody [was] not less than 10 years to life" and "[t]he guideline[s] provision [was] life."  Id. at

15.

        After consulting the advisory guidelines and the § 3553(a) factors, Judge McLaughlin

explained that in his view defendant was "a drug king pin in charge of . . . one of the larger

conspiracies prosecuted in [the Erie] area."  Id. at 17.  Defendant "used intimidation and threats

to protect his drug dealing operation" and the evidence at trial reflected that defendant displayed

"a complete lack of respect for the law, his fellow citizens and even his own family members."

Id.  And he was "convinced that if [defendant] were released from jail, he would quickly resume

his criminal activities."  Based on these findings and assessments, Judge McLaughlin again imposed a life sentence.  Id.

Defendant appealed and challenged the reimposition of a life sentence on the grounds that "the district judge engaged in impermissible judicial factfinding and that the life sentence is *per se* unreasonable."  United States v. Cooley, 205 F. A'ppx 17, 18 (3d Cir. 2006).  The United States Court of Appeals for the Third Circuit affirmed.  It rejected defendant's contention that the facts underlying the guidelines calculations had to be submitted to a jury and proved beyond a reasonable doubt.  Instead, "[u]nder the advisory guidelines system, a reasonable [guidelines] enhancement applied at the District Court's discretion does not exceed the statutory maximum."  Id. at 19.

The Third Circuit likewise rejected defendant's challenge to his sentence.  It held that the sentence "was not unreasonable" and explained: "[t]he life sentence in this case is severe, but it is one that is authorized by Congress and it is not unreasonable given the breadth and depth of the defendant's drug ring."  Id.  It thus affirmed.  Id.

With the above backdrop in mind, we turn to the specifics of defendant's First Step Act motion.  Defendant was convicted of and sentenced for a covered offense.  On February 25, 2004, defendant was sentenced to life imprisonment based on the attribution of more than 1.5 kilograms of crack cocaine pursuant to his involvement in a § 846 conspiracy.  The sentence of life was at that time mandated by the sentencing guidelines and it reflected the highest statutory maximum sentence under §§ 846 and 841(b)(1) at the time.  The same sentence was reimposed on October 18, 2005, pursuant to the advisory guidelines scheme established by Booker.  The Third Circuit determined that defendant was found guilty of an offense which triggered the penalties of 21 U.S.C. § 841(b)(1)(A)(iii), because it held that defendant's constitutional rights were not violated at trial and the sentence of life did not

exceed the statutory maximum sentence established by the jury's determination of guilt.

Cooley, 205 F. A'ppx at 19.  The offense was committed prior to August 3, 2010.

  To sustain the conviction in violation of § 846 and §841(b)(1)(A)(iii), the relevant

statutory element the government was required to prove was that the offense involved an

agreement to distribute or possess with the intent to distribute more than 50 grams of crack

cocaine.  Sections 2 and 3 of the Fair Sentencing Act modified the statutory penalty for this

offense by raising the threshold quantity "to trigger the 10-years-to-life range" to 280 grams

and lowering the penalty range for 50 grams to the "5-to-40-year range." Easter, 975 F.3d at

321.  Under the controlling "statute of conviction approach," defendant was convicted of and

sentenced for a "covered offense" as defined by the First Step Act.  Jackson, 964 F.3d at 202

& n.6; accord United States v. Hardwick, 802 F. App'x 707, 708-09 (3d Cir. 2020)

(recognizing First Step Act applies to § 846 conspiracies to distribute cocaine base); United

States v. Willis, 2020 WL 6131129 (E.D. Pa., Oct. 19, 2020) (Kearny, J.) (treating § 846

conspiracy to distribute crack cocaine as a covered offense); United States v. Gravatt, 953

F.3d 258, 259 (4th Cir. 2020) (section 846 does not proscribe the possession or distribution of

any particular controlled substance or the punishment for the same and thus the conspiracy

charge must incorporate the substantive offense and penalties in §§ 841(a)(1) and 841(b)(1);

and a charged conspiracy to distribute multiple controlled substances, one of which is cocaine

base, is a covered offense under First Step Act); United States v. Johnson, 2020 WL 6482695,

*3 (Nov. 4, 2020) (conspiracy convictions based on multiple-object distribution schemes

constitute covered offenses provided at least one of the objects informing the sentencing was

cocaine base); United States v. Mitchell, -- F. App'x --, 2020 WL 6117698, *3 (6th Cir. Oct.

16, 2020) (Stranch, J, concurring) (collecting growing appellate authority recognizing that a

defendant need only be convicted of one covered offense to be eligible for resentencing on an aggregate penalty for diverse convictions).

Application of the changes in the Fair Sentencing Act of 2010 produces a meaningful difference in the statutory penalties and guidelines sentencing range in this case. First, the Fair Sentencing Act had a direct impact on defendant's statutory penalties: a jury determined that he had distributed 50 grams or more of cocaine base. The statutory maximum term authorized by that verdict under the Fair Sentencing Act is 5 to 40 years of incarceration. Thus, the Act decreased the statutory penalties that could be imposed based on the jury's verdict.

Second, defendant's benchmark guidelines range has been deceased. Under the guidelines, defendant's distribution of at least 1.5 kilograms of crack cocaine when coupled with the specific offense characteristic increases for leadership, possessing a weapon and obstruction of justice would still produce an initial base offense level of 46, which must be reduced to 43 (the highest offense level in the 2005 guidelines). An adjusted base offense level of 43 when coupled with a criminal history category of II still produces an initial guidelines range of life. But because the calculated guidelines range exceeds the statutory maximum sentence permitted by law, the guidelines themselves require that the range be lowered to 480 months. See U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.").

While the government seeks to downplay the impact of the difference in the guidelines resulting from the application of the Fair Sentencing Act, see Gov. Brief in Opposition (Doc. No. 220) at 18 n.1, it cannot be argued that the Fair Sentencing Act does not have a meaningful impact on defendant's benchmark guidelines calculations; the sentence of life would not be an authorized sentence under the guidelines when the changes of the Act are applied. Instead, it

would be an unlawful sentence in light of the jury's verdict.  Given this state of affairs, the notion that such a change is not a basis for a sentencing reduction pursuant to the First Step Act is untenable.

Moreover, we likewise decline to treat the guidelines as binding under the First Step Act. First, the courts repeated have rejected the notion that eligibility for relief is dependent on a favorable change in the defendant's guidelines sentencing range.  Jackson, 964 F.3d at 204-05 (holding the defendant was entitled to consideration of his First Step Act motion on the merits notwithstanding the district court's determination that his guidelines range had not changed and opining that Congress's intent was to "afford relief to [other] pre-Fair Sentencing Act offenders, including those who were heretofore ineligible.") (quoting Wirsing, 943 F.3d at 186); Easter, 975 F.3d at 322 (exercising the discretion under the First Step Act must be undertaken even though a change in the guidelines sentence range has not occurred);  United States v. Frederick, 2020 WL 5555302, *2 (W.D. Pa. Feb. 4, 2020) ("defendant's eligibility is determined solely by qualifying under the First Step Act's definition of a covered offense and is not conditioned on a corresponding decrease in the applicable guidelines sentencing range") (collecting cases).  This principle follows in part because the authority to re-impose a modified sentence under the First Step Act is authorized by 18 U.S.C. § 3582(c)(1)(B).  Hardwick, 802 F. App'x at 709; Easter, 975 F.3d at 323 ("First Step Act motions fall under § 3582(c)(1)(B).").  Given this authority, the courts have rejected the imposition of limitations beyond those set forth in subsection c of § 404 of the First Step Act.  See Jackson, 964 F.3d at 205 ("Beyond a few specific limitations found within the First Step Act, we see 'no indication that Congress intended a complicated and eligibility-limiting determination at the 'covered offense' stage of the analysis.'") (quoting Wirsing, 943 F.3d at 186 (citing § 404(a)).  If we were to conclude that the United States Sentencing Guidelines applicable at the time defendant was sentenced must be given controlling

effect today, we would be engrafting a limitation on eligibility into § 404 that Congress chose not place in the statute it enacted.  And such a requirement would appear to run counter to the statutory purpose for which Congress acted and the potential remedy it sought to provide. Easter, 975 F.3d at 323 ("Since the First Step Act would have a minimal impact on inmates who had previously benefited via the Guidelines, Congress's intent must have been to afford relief "to [other] pre-Fair Sentencing Act offenders, including those who were heretofore ineligible." Wirsing, 943 F.3d at 186.  This suggests that Congress wanted the First Step Act to have a broad effect.").

Of course, the sentence this court is authorized to impose at this juncture cannot be based only on a mechanical application of the "benchmark guidelines"; instead, the exercise of that discretion must be grounded in the deeply rooted "federal sentencing framework" that has been created by the longstanding application of both the guidelines and the § 3553(a) factors and it must reflect an assessment reached after considering the "fullest information possible concerning the defendant's life and characteristics."  Shields, 48 F.4th at 191.

In determining the degree of relief, if any, that should be given, we begin by taking note of the changes that have transpired over the past 20 years with regard to defendant's offense conduct and criminal history.  While not directly relevant, the correlation between these two sentencing ranges does shed light on the ameliorative adjustments that have been made to the treatment of crack cocaine offenses under the statute and United States Sentencing Guidelines.

The highest amount of crack cocaine attributable to defendant by express judicial finding was 35 to 40 kilograms.  While Judge Mclaughlin referenced the government witnesses' testimony relaying the vast quantities of crack cocaine distributed by the conspiracy, at the time of the offense the elements required only proof of 50 grams or more of crack cocaine.  The

judicial finding as to the amount triggering the Guidelines range of life was "more than 1.5 kilograms" in 2004.  See Presentence Investigation Report at ¶ .

In 2004, the offense level for 1.5 kilograms of crack cocaine was set at 38 pursuant to U.S.S.G. § 2D1.1(c)(5).  Defendant received a 4 level increase for a leadership role, a 2 level increase for possessing a weapon and a 2 level increase for obstruction of justice.  A combined offense level of 46 and criminal history category II produced a guidelines sentencing range of life.  Attribution of more than 25.2 kilograms of crack with the same Chapter Three enhancements and Chapter Four criminal history category would be required to produce the same base offense level under the 2023 guidelines.  In other words, the amount of crack cocaine required to trigger the sentence imposed on defendant under the guidelines has been increased 16.8-fold – from 1.5 kilograms to 25.2 kilograms.

The record reflects only two attributions of crack cocaine to defendant by judicial finding that have been subjected to appellate review.  The initial finding of 35 to 40 kilograms in 2004 (which equated to "more than 1.5 kilograms" under guidelines), and the finding of the same amount by incorporation at resentencing in 2005.  The appellate court's review of each of these findings was limited to a determination that the amount was in excess of 1.5 kilograms and the information informing the trial court's estimate had sufficient indicia of reliability.  See United States v. Cooley, 131 F. App'x at 883("At sentencing, the district court found that Cooley trafficked in over 1.5 kilograms of crack cocaine . . ."); United States v. Cooley, 205 F. A'ppx at 18 ("The sentence included enhancements for (1) trafficking in over 1.5 kilograms of crack cocaine . . .").

In 2004, the attribution of 1.5 kilograms or more of crack cocaine with a criminal history category of II would produce a base offense level of 38 (without consideration of the additional enhancements), with a resulting sentencing range of 262 to 327 months.  Today, the attribution

18

of 1.5 kilograms and a criminal history category of II would produce a base offense level of 32 (without consideration of the addition enhancements), with a resulting sentencing range of 135 to 168 months.  In 2004, the attribution of 35 kilograms or more would still result in a base offense level of 38 (without consideration of the additional enhancements) and a resulting sentencing range of 262 to 327 months.  In 2023, the attribution of 35 kilograms or more would still result in a base offense level of 38 (without consideration of the additional enhancements) and a resulting sentencing range of 262 to 327 months; and attribution of more than 35 kilograms with the additional enhancements would produce an adjusted base offense level of 43 and a resulting sentencing range of 360 to 480 months.  See Chapter Five, 2023 United States Sentencing Guidelines Manual, https://www.ussc.gov/guidelines/2023-guidelines-manual-annotated.  This reflects a 48.5% reduction in the punishment for the triggering quantity necessarily found by the jury (and reviewed on appeal); it also reflects a reduction from "life" to 360 to 480 for the amount of crack cocaine when the additional enhancements are taken into account; and it does not reflect a reduction for the amount of crack cocaine found by judicial determination at sentencing.

    To be clear, the court will credit the government's contention that it could charge and prove a quantity of crack cocaine attributable to defendant that would again trigger an advisory guidelines sentencing range of 262 to 327 months and would produce an adjusted base offense level of life under any criminal history category when the specific offense characteristics are taken into account.  That said, the above changes in the treatment of crack cocaine do not have a direct impact on the advisory guidelines the court must consider in the exercise of its discretion.  Nevertheless, they do provide some measure of comparison for the purpose of determining how defendant's offense conduct and criminal history (to the extent they were subjected to prior appellate review) would be treated today.  And considering these variations in a general manner

is in keeping with the remedial purposes of the First Step Act and the "do-over of sorts" it has provided for offenders falling with its ambit.  See United States v. Frederick, 2:07cr387 (W.D. Pa. Feb. , 2020),  Doc. No. 452 at p. 9 ("A major purpose of the First Step Act was to permit the court to impose a revised sentence that reflects the congressional judgment that the current sentencing norms and standards more adequately reflect the seriousness of crack cocaine offenses.") (citing United States v. Mitchell, 2019 WL 2647571, *8 (D. D.C., June 27, 2019) (the fact that defendant would not qualify as a career offender if sentenced today appropriately is considered in exercising the court's discretionary authority under the First Step Act) (quoting United States v. Biggs, 2019 WL 2120226, *4 (N.D. Ill., May 15, 2019) ("Because the Fair Sentencing Act and the First Step Act reflect Congress's judgment that shorter prison sentences adequately reflect the seriousness of crack cocaine offenses, reduction of Biggs's sentence aligns the statutory purposes of sentencing with the goal of the reform legislation.").  In other words, although defendant is not entitled to a full resentencing at this juncture and we operate with the understanding that his guidelines sentencing range of life remains unchanged, the ameliorative adjustments in punishment for the specific findings of drug quantity in the record when considered in conjunction with a criminal history category of II do provide a backdrop that will be considered in the exercise of our discretion.

Other aspects of the record also support the exercise of discretion on defendant's behalf. Defendant has displayed a long-standing commitment to better himself and in turn support the emotional and spiritual needs of other inmates.  He has a spotless institutional record when it comes to discipline.  He has pursued education and programming opportunities at every turn and sought to improve himself in significant and numerous ways designed to gain maturity and promote meaningful self-improvement and growth.  And in doing so he has continually earned the respect of Bureau of Prisons supervising staff.

Defendant has spent significant time developing the skills needed to work as an inmate pastor, a peer assistant in the Bureau's Drug Education Program and a mentor for inmates at risk of suicide and/or experiencing poor emotional health. Through these efforts he has sought and seeks to help younger inmates acquire the skills to re-enter society successfully upon release.

Almost immediately upon incarceration, defendant began pursuing college-level courses and institutional programming that would improve his educational and vocational skills. His early courses were aimed at improving skills in developing a career, interviewing, job fairs, outreach training, resume writing and tutor training. See, e.g., Inmate Education Data Transcript (Doc. No. 215-5) at 2. He took classes designed to improve his cognitive skills, emotional health and handling conflict. Id. He also gained training in physical health, nutrition and sports injury/wellness. Id. at 1. He completed many "Men of Influence" classes in parenting, healthy lifestyles, money management, finance/financial planning and parenthood. Id. He has continued to pursue programming in these areas throughout the 16 years reflected in his personal transcript. Id. at 1-27.

Defendant entered prison with a General Equivalency Degree. He began to pursue classes in theology, earning his first theology college credits in August of 2005. Id. at 2. He earned a two-years Associates Degree in Bible Theology in November of 2008 from the International College of Bible Theology. Associate Degree (Doc. No. 215-2 at p.4). He went on to earn a Master Degree from the Midwest Seminary of Bible Theology in July of 2015. Transcript (Doc. No. 215-2 at 2). And then he earned a Doctor of Ministry Degree in January of 2017. Doctorate Degree (Doc. No. 215-2 at 1). He was ordained as a pastor by the Transfiguration Ministries Worldwide. Id.

Defendant consistently has put his skills to work for the benefit of his fellow inmates. For example, he enrolled in a Drug & Alcohol Treatment Specialist Program in November of

2012, sponsored through Stratford Career Institute and completed the course of study in November of 2013.  Letter of Completion (Doc. No. 215-4) at 1.  Thereafter, he began serving as a "Peer Assistant" in the Bureau's "Drug Education = Freedom From Drugs Program" at FCI Otisville and assisting as a guest lecturer, earning multiple certificates for his service in 2014 and 2015.  Certificates (Doc. No. 215-4) at 2-8.

Defendant has completed training as a Psychology Inmate Suicide Companion and has worked as a Suicide Watch Inmate Companion at FCI Schuylkill.  Certificate/Job Description (Doc. No.  215-3) at 1-2.  In this capacity defendant was responsible for providing a vital link between potentially suicidal inmates (inmates deemed to be a high risk for self-destructive acts) and staff.  Id. at 2.  He also served as an assistant to inmates who might be experiencing problems related to adjustment and various mental issues.  Id.

Defendant has earned the respect of prison staff when assisting in the various positions he has held and the assistance he has provided over the years.  For example, he received numerous certificates for being a "peer assistant" in drug education programs administered at FCI Otisville.  See, e.g., Certificates of Completion from April 15, 2014, to November 24, 2015 (Doc. No. 215-4).  And he presented as a "Guest Speaker at the Annual Volunteer Banquet" for this program in April of 2015.  Id.  Similarly, a Religious Services Assistant commended defendant in his work as a chapel orderly at FCI Victorville in June of 2018.  See Letter of J. Chasse (Doc. No. 215-6).  And he completed/kept current training in "Psychological Inmate Suicide Companion Training" and was selected for the position of a Suicide Watch Inmate Companion at FCI Schuylkill, working closely with the Staff Psychologist, Dr. L. DePierre, and Department Head Dr. M. Doman, Chief Psychologist.  See Appointment Form of April 5, 2018, and Training Certificate of February 1, 2019 (Doc. No. 215-3).

22

Defendant has continued to earn this respect and praise for his recent work as a Suicide Watch Companion and Unit 3A Orderly.  In 2022, defendant received "good work evaluations on a monthly basis" and "maintain[ed] a positive rapport with his supervisor."  Summary Reentry Plan – Progress Report of April 7, 2022 (Doc. No. 235-3).  He requires "little to no supervision while completing task[s]."  Id.  And Bureau of Prison staff are convinced that his institutional work skills will translate to positive work ethic and skills if he were to be released.  Specifically, it is noted in his work assignment summary that

> [t]houghout his term of incarceration inmate Cooley has obtained skill settings that can be beneficial if release[d] from prison and assist with his adjustment to society.  He has participated in appropriate programming that will assist him in obtaining gainful employment if released.  He displays the aptitude to learn and eagerness to learn task so he can adapt to any working setting.

Id.

And Bureau staff likewise note the import of defendant's educational accomplishments. Among other things, it is noted that defendant has "completed all six core topics of the Release Preparation Program."  Id.  They also highlight that defendant earned his Doctorate Degree in Theology in 2017 and the extensive academic programs he has completed while confined at several different institutions.  In their view: "[t]hese programs and classes he completed throughout his term of incarceration have helped him develop a positive outlook and gain[] the tools to obtain employment and assist with his transition back into the community."  Id.

Defendant has continued to maintain these behaviors and attributes into 2023.  See Summary Reentry Plan – Progress Report of April 2, 2023 (Doc. No. 236-1).  Through his persistent pursuit of self-improvement he has obtained the programming and experience needed for release, should he become eligible.  Id.  Areas that he will need ongoing assistance include financial, medical, substance abuse, and trauma support.  Id.  He also will need to gain employment.  He has worked to address each of these areas and prepare for success upon reentry into society.  He continues to pursue programming in the areas of strength, occupational

education and "Money Smart."  Id.   He has saved $2,550.00 to assist with his transition back

into the community.  Id.

     In addition to the summary information highlighted in the 2022 report, Bureau staff noted

that defendant was transferred to FCI Schuylkill on October 22, 2018, "as a Nearer Release

transfer."  Id.  He has maintained "clear" conduct since the beginning of his incarceration on

December 9, 2002.  Id.  "Based on his good Institutional adjustment and work performance he

was approved for transfer to a Low security facility.  Due to the COVID-19 pandemic he

remained at FCI Schuylkill."  Id.  Bureau staff further report:

> Inmate Cooley has maintained a positive outlook and attitude and has been a positive role
> model to his peers by review of his work supervisors.   It should be noted inmate Cooley
> has a "Minimum" recidivism risk category PATTERN score (Prisoner Assessment Tool
> Targeting Estimated Risk and Needs).  Since his arrival to FCI Schuylkill Inmate Cooley
> has continually shown he [is] capable of being a law abiding citizen if release from prison.
> He has extraordinary rehabilitative achievements through out his term of incarceration and
> continues to mentor younger inmates even though he has a life sentence.

Id.

     Defendant's direct supervisor in his housing unit at FCI Schuylkill gained the same

impressions after working with him.  Counselor B. Rakus advises:

> Inmate Cooley, John #20139-068 has been the head orderly in the 3A housing unit as well
> as assigned to the caseload since February 2022, as well as my head orderly while I was an
> officer on unit 3A for 6 months.  In the amount of time I have known him, he has been
> nothing short of a model inmate, and generally I believe him to be a good and caring
> person.  If given a chance to enter back into society he would be easily able to adapt and
> function in the same manner as a model citizen and productive member of society in any
> place he may choose to live.

Letter of B. Rakus, Correctional Counselor (Doc. No. 235-2).

     Defendant has maintained "clear" institutional conduct for over 20 years.  He does not

have any infractions in his institutional record.  His institutional behavior would have earned

him at least 1080 days of good time credit.  He has a 20 year record of self-improvement

through education and positions within the Bureau ranging from providing assistance with

drug programming, mentoring young inmates, providing religious services and assisting inmates at risk of suicide or suffering poor mental health.  He has earned the respect and support of Bureau staff throughout his incarceration and it is clear that staff who have spent time supervising him strongly support his reentry into society.

Other aspects of the record also support the disposition we reach.  Defendant has gained a true appreciation of the gravity of his offense and has sincere remorse for that conduct.  See Letter of April 3, 2023 (Doc. No. 236).  He has a genuine feeling of empathy for those who were harmed by it.  Id.  And he has developed the serious medical conditions of "mild peripheral arterial occlusive disease and symptoms consistent with neuropathy."  See Hospitalization Summary of March 2, 2022 (Doc. No. 235-1).

Defendant's post-offense rehabilitation efforts reflect factors that commonly support a variance and further support the exercise of our discretion here.  He has been nothing short of an exemplary inmate.  He continually has taken advantage of the educational and recreational programs made available to him.  He persistently has sought to improve his personal and social skills through these classes and programs.  He has developed the skills needed to be a peer assistant and guest speaker in drug and alcohol programs, obtained a doctorate degree in theology and become a pastor, and persistently has been a mentor to younger inmates in various capacities.  He has gone beyond these significant accomplishments and completed "Psychological Inmate Suicide Companion Training" and occupied the meaningful and trusted position of being a Suicide Watch Inmate Companion.  He has earned the respect of correctional staff with whom he interacts.

Defendant's post-sentencing efforts toward improving himself as a human being are extensive and nothing short of remarkable.  He has spent the past 21 years improving himself so that he may help others who are need.  He did most of this without any realistic expectation of

ever being released.  In doing so, he has developed a solid foundation and meaningful skills for successful reintegration into community life.  These significant and ongoing efforts to improve himself and the chances of his success upon release further support the exercise of our discretion and the reduced sentence of time served.

Defendant's prior criminal history also has an impact on our decision.  Defendant committed his only prior offense at a very young age.  He was just 19 years of age at the time. He and a codefendant burglarized a radio store in 1976.  Defendant was sentenced to 24 to 60 months and ordered to pay $80.14 in restitution.  Defendant had no other criminal convictions after his release until he was indicted on the instant charge over twenty years later.   While the conspiracy developed in the early 1990s, defendant's age at the time he committed his only prior offense, the degree of punishment the presiding judge found to be appropriate for this criminal conduct, and his lack of other significant criminal conduct are factors that typically provide a basis for some degree of leniency at sentencing and further support the exercise of our discretion at this juncture.  And this history only takes on additional significance when the lack of any incremental increase in punishment between the 24 month sentence imposed in 1976 and the life sentence imposed in 2004 is taken into account.

Defendant likewise has spent the past few years in custody while the COVID-19 pandemic unleashed its horrors.  During these times defendant's liberty and privileges were even more curtailed.  He was inflicted with COVID in January of 2022 and recovered while incarcerated.  These years of incarceration were even more onerous, restrictive and challenging. Serving time under these conditions is yet another factor that appropriately is considered in exercising our discretion.

Finally, defendant has matured to the point where he possesses a minimal risk of recidivism.  He was 36 when the offense commenced in 1992 and 47 when he was sentenced in

2004.  He has served over 21 years.  He is now 67 and has reached an age where the statistics on the recidivism show that his likelihood of re-offending has meaningfully declined.[3]  His current age, significant period of incarceration, maturation and post-sentencing conduct while incarcerated bode well for his successful reintegration.  Collectively, these factors further support the determination that a re-imposed sentence of time served is a sufficient term of incarceration.

Consideration of all of the above through the lens of the § 3553(a) factors convinces us that the proper exercise of discretion is a reduction to a term of incarceration of time served plus a reasonable period, not to exceed 21 days, for processing his release to be followed by 4 years of supervised release.  A reduction of this degree strikes the proper balance in applying the § 3553(a) factors and imposes a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing.  Although defendant's drug-trafficking offense truly was the result of a major drug-trafficking operation and it involved a number of exacerbating circumstances, a sentence that is equivalent to 290 months is a significant sentence that adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.  It likewise is sufficient to serve the interests of promoting adequate deterrence and protecting society from harm.  It further appears to have satisfied the need to rehabilitate defendant.  Accordingly, defendant's motion pursuant to Section 404 of the First Step Act will be granted and a Judgment Order of Conviction and Sentence imposing this new sentence will be issued.

Date: January 31, 2024

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

---

[3]  See National Institute of Justice, Five Things About Deterrence (May 2016), at 2, available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf  ("Even those individuals who commit crimes at the highest rates begin to change their criminal behavior as they age.  The data show a steep decline at about age 35.").

cc:    Adam N. Hallowell, AUSA
        Christian A. Trabold, AUSA
        Samantha L. Stern, AFPD

        (*Via CM/ECF Electronic Mail*)